IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION


TAMMY CHRISTINE HANSON                                        PLAINTIFF

        v.                          Civil No. 10-3022

BAXTER COUNTY, ARKANSAS;
SHERIFF JOHN MONTGOMERY;
CHIEF DEPUTY JEFF LEWIS;
LIEUTENANT RANDALL WEAVER;
SARGENT EDWARD ELLIOTT;
CORPORAL LINDA HENRYK;
DR. JOSEPH TULLIS; DEPUTY WILTON
"CHIP" NORRIS; JAILER HELEN FENWICK;
JAILER TONY BECK; JAILER WILLIAM
ALTRAZAN; JAILER HEATHER EASTER;
JAILER GARNETT McMAHON; JAILER
SHERRY LEWIS; JAILER PATRICK GAULT;
JAILER JAMES TUDOR; JAILER SONYA OLNAY;
and JAILER TONY BECK                                         DEFENDANTS

## REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE

        This is a civil rights action filed by the Plaintiff, Tammy Christine Hanson, under the

provisions of 42 U.S.C. § 1981 and 42 U.S.C. § 1983.  Plaintiff is *pro se*.

        At the times relevant to this case, Plaintiff was incarcerated in the Baxter County

Detention Center (BCDC).  She maintains her constitutional rights were violated in the following

ways:  (1) she was denied adequate medical treatment; (2) she was subjected to unconstitutional

conditions of confinement; (3) she was not permitted to exercise her Freedom of Religion; and,

(4) Sheriff Montgomery failed to properly train or supervise the employees of the BCDC.

        A motion for summary judgment (Docs. 43, 44 & 45) has been filed by Separate

Defendant Dr. Joe Mitchell Tullis.  A motion for summary judgment has also been filed on

behalf of all the BCDC Defendants (Docs. 46, 47 & 48)(collectively referred to as the Baxter

County Defendants).   Plaintiff has responded to the motions (Docs. 54 & 55).[1] The motion is now ready for decision.

### 1.  Background

Hanson was booked into the BCDC on September 25, 2009, on a misdemeanor failure to appear charge in answer to a citation of cruelty to animals.   *Baxter County Defendants' Exhibit* 1 at pg. 1 (hereinafter *BCDC's Ex*).  The warrant was served on Hanson by Defendant Tony Beck.  *Id.* at pg. 4.  Hanson remained incarcerated until July 10, 2010.  *Plaintiff's Exhibit* 13 at ¶ 2 (hereinafter *Plff's Ex.*).  The intake booking sheet does not list a religious preference for Hanson.  *BCDC's Defts' Ex.* 1 at pg. 1.

#### *Medical Information, Requests & Testing*

When she was booked in, an inmate medical form was completed.  *BCDC's Ex.* 2 at pg. 1.  The form consists of six questions.  *Id.*  It indicates Hanson has "several illnesses," is on "several meds," and is under a doctor's care.  *Id.*  No other information appears on the form.  *Id.* A second inmate medical form was completed on November 4, 2009.  *Id.* at pg. 5.  This form contains the following notations:  "thiroid noverian cancer synthryold ptu dr mccoennell dr herzog."  *Id.*  A third inmate medical form was completed on January 6, 2010.  *BCDC's Ex.* 2 at pg. 12.  This form indicates Hanson has thyroid disease and ovarian cancer.  *Id.*  It also indicates she is taking propylthiouracil (PTU), levothyroxine, atenolol, Prilosec, and vitamins and is under the care of "Dr. Ocanal and Dr. Ersog and Chip Norris."  *Id.*

According to Hanson's mother, Christine Doneski, Hanson was in possession of her two thyroid medications PTU and levothyroxine when she was booked in.  *Plff's Ex.* 13 at ¶ 3.  On September 15th, Dr. Robert J. McConnell wrote a letter to Hanson's attorney stating  she had been treated intermittently with antithyroid medication for almost eight years.  *Plff's Ex.* 2

---

[1] In her response, Plaintiff states the BCDC Defendants have not fully complied with her discovery requests.  Specifically, she states they have not produced electronic surveillance tapes.  Plaintiff is directed to file a motion to compel on this issue.

(hereinafter *Plff's Ex.*).  He noted she was currently on a combination of propylthiouracil and a thyroid hormone.  *Id.*  Because of the nature of her disorder, Dr. McConnell noted her medication should be taken at regular intervals and that skipping the medication could lead to a severe exacerbation of her hyperthyroidism.  *Id.*  Doneski asserts that she provided a copy of this letter to Jail Administrator, Randy Weaver.  *Plff's Ex.* 13 at ¶ 8.

According to Doneski, "[o]n most occasions when my daughter required medical care . . . I was contacted by Dr. Joe Tullis and the Baxter County Detention Center personnel and told that I would be required to make the necessary doctor's appointments and personally pay for my daughter's healthcare treatment," dental care, and prescribed medications.  *Plff's Ex.* 13 at ¶ 14, ¶ 20 & ¶ 22.

Dr. Tullis is a board certified radiologist practicing medicine in Mountain Home, Baxter County, Arkansas.  *Tullis' Exhibit* 1 at ¶ 2.  He is the medical care coordinator for the BCDC. *Id.*  In this capacity, he assists in obtaining medical consultations for inmates when their needs cannot be met by medical care providers employed by Baxter County.  *Id.* at ¶ 3.  He is not involved in the training or supervision of jail employees or involved in any aspect of the day to day operations of the jail.  *Id.* at ¶ 4.

Routine care and treatment was provided by an Advanced Nurse Practitioner (APN), Chip Norris.  *Tullis' Ex.* 1 at ¶¶ 6 & 8.   Dr. Tullis arranged for Hanson to be seen at the emergency room on September 27th for a suspected urinary tract infection as well as on September 30th for suspected anemia.  *Id.* at ¶ 7.

Dr. Tullis noted an acute abdominal series was done on December 12, 2009, as well as CTs of the abdomen, chest, and pelvis on January 5, 2010, and two pelvic ultrasounds one on December 8th and the other one on December 12th.  *Tullis' Ex.* 1 at ¶ 7; *Tullis' Ex.* 2 at pg. 8. The tests showed complex benign hemorrhagic cysts that had changed in appearance between ultrasounds, had ruptured, and resolved.  *Tullis Ex.* 1 at ¶¶ 8-9.  Dr. Tullis remarked Hanson had

-3-

been taken to Dr. Eric Shultz's office for a gynecologic evaluation, including a endometrial biopsy, and no evidence of ovarian or other cancer was found. *Id.* at ¶ 9. *See also Tullis' Ex.* 2 at pg. 44.

On February 5, 2010, Dr. Tullis noted Hanson had underwent a complete diagnostic work up and physical examination at Baxter Regional Hospital. *Tullis Ex.* 1 at ¶ 10; *Tullis' Ex.* 2 at pgs. 15-40. The urinalysis and bladder scan were essentially normal; however, Hanson was provided with a preventative dose of antibiotics. *Tullis' Ex.* 1 at ¶ 10. On March 23rd, Hanson underwent another pelvic ultrasound that revealed no ovarian cysts and no abnormalities. *Tullis' Ex.* 1 at ¶ 11; *Tullis' Ex.* 2 at pg. 43. Urinalysis testing revealed no evidence of infection. *Tullis' Ex.* 1 at ¶11; *Tullis' Ex.* 2 at pg. 44.

Dr. Tullis notes that Hanson did suffer from hyperthyroidism. *Tullis Ex.* 1 at ¶ 12. When he approached Hanson about treatment options, Dr. Tullis states he was told the condition was being followed by an endocrinologist in New York. *Id.* Dr. Tullis provided copies of Hanson's medical records to the jail to be given to Hanson's mother for forwarding to the endocrinologist. *Id.* According to Dr. Tullis, Hanson did not want him to conduct further evaluation or seek additional consultations for her hyperthyroidism. *Id.*

Hanson was transported to an appointment with Dr. Abraham on February 17th. *Tullis' Ex.* 6 at pg. 17. However, when she refused to provide him with documentation regarding her ovarian cancer, he refused to refer her to a urologist and stated he would not see her again unless he was provided with the documentation he requested. *Id.*

Dr. Tullis wrote Hanson a letter dated February 25th outlining the medical care she had received to date. *Tullis' Ex.* 2 at pgs. 41-42. After Hanson wrote to the state medical board claiming that APN Norris and Dr. Tullis denied her medical care, Dr. Tullis advised her by letter dated March 24th he would no longer coordinate her care. *Tullis Ex.* 1 at ¶ 13; *Tullis' Ex.* 2 at pg. 46. He advised her that he and APN Norris deferred her treatment and consultation to any

AO72A
(Rev. 8/82)

local medical generalist or specialist she cared to see. *Id.* He also noted that her thyroid studies were "again borderline abnormal, and our consultants do not agree with the treatment you are receiving; however, we defer that completely to your endocrinologist in New York." *Tullis' Ex.* 2 at pg. 46.

It was also noted that Hanson had a large goiter. *Id.* However, Dr. Tullis again noted he had been informed that her thyroid was being followed by, and treatment directed by, Hanson's endocrinologist in New York. *Id.*

Records from Baxter Regional Medical Center Emergency Center indicate Hanson was treated at the emergency room late in the evening on September 27, 2009, for a urinary tract infection. *BCDC's Ex.* 3A at pg. 2; *Tullis' Ex.* 2 at pg. 1. She was instructed to drink plenty of fluid and cranberry juice was especially recommended. *BCDC's Ex.* 3A at pg. 3. Dr. Margo Lockyer prescribed Hanson an antibiotic, Cipro 250 mg., one tablet each day for five days. *Id.* at pg. 5.

On September 30th, Dr. Allen Jackson wrote a prescription that said: "Please allow 4 ounces of cranberry juice twice daily as well as 1 banana daily. Please allow second mat to sleep on." *BCDC's Ex.* 2 at pg. 2.

Hanson was again treated at the emergency room on October 1st, for possible anemia. *BCDC's Ex.* 3A at pg. 6; *Tullis' Ex.* 2 at pg. 4. She was advised to drink four ounces of cranberry juice twice daily and eat a banana daily and instructed to call Dr. Bruce White when her medical records arrived for an appointment. *BCDC's Ex.* 3A at pg. 7.

On October 14th, Plaintiff requested treatment for an infected toe nail. *BCDC's Ex.* 2 at pg. 3. She was seen by APN Norris who offered to perform a wedge resection. *Id.* A note was made that she had possible vaginitis and she was prescribed diflucan. *Id.* On October 22nd, she again complained about the toe nail and of severe bladder pain. *Id.* at pg. 4. She was seen by APN Norris on October 26th and prescribed Cipro and APN Norris offered again to perform

-5-

a wedge resection. *Id.* APN Norris also noted she should be taken to the hospital for lab work to check her potassium levels and for a urinalysis. *Id.*

On November 10th, Hanson asked for Epsom salt to soak her toe. *BCDC's Ex. 2 at pg. 6.* On November 13th, APN Norris approved Hanson's request for Epsom salts. *Id.* at pg. 6.

On December 8th, a final report was written with the results from the pelvic ultrasound. *Plff's Ex.* 12 at pg. 1. The diagnostic impressions were: (1) bulky, globular uterus with a fibroid present, and a small cervical cyst; and (2) bilateral, complex ovarian masses. *Id.*

On December 10th, Hanson submitted a medical request noting she had a history of ovarian tumors and hypothyroid. *BCDC's Ex.* 2 at pg. 7. The plan was to get Hanson an appointment with a surgeon. *Id.* at pg. 8. She was prescribed atenolol, lortab, and PTU. *Id.* December 11th, Hanson submitted a medical request stating she had been coughing all night, her chest felt heavy, and she was vomiting. *Id.* at pg. 9. APN Norris saw her on the 21st and noted her examination was normal and that she had been to her gynecological appointment. *Id.*

Hanson submitted a medical request on December 31st stating she had a vaginal infection and severe bladder and abdominal pain. *BCDC's Ex.* 2 at pg. 10. She was seen by APN Norris on January 4, 2010, and prescribed diflucan and due to her complaint of vomiting was scheduled for a CT scan of her abdomen and pelvis. *Id.* at pg. 11. APN Norris noted he had discussed her complaints with Dr. Tullis. *Id.*

On January 19th, Hanson filed a petition of writ of mandamus with the Baxter County Circuit Court. *Plff's Ex.* 37. Among other things, she asked that the court direct the Sheriff to provide her with all necessary medical care. *Id.* at pg. 5.

On January 30th, Hanson wrote a letter requesting Dr. Tullis' medical assistance with regard to her ongoing health conditions. *Plff's Ex.* 31 at pg. 1. She indicated she was having severe and persistent symptoms and that APN Norris became restless and agitated when she attempted to discuss the situation with him. *Id.* Since December 11th, when her ovarian mass

AO72A
(Rev. 8/82)

ruptured she stated she was experiencing persistent nausea, vomiting, and severe headaches. *Id.* She stated she had continued to suffer diarrhea, loss of body weight, and had developed some sort of reflux. *Id.* She also noted that she continued to suffer from painful urination accompanied by a burning sensation and an inability to urinate at times. *Id.* at pg. 2. Finally, she stated that she was repeatedly developing vaginal yeast infections. *Id.* She stated she strongly felt that she should have further testing and be referred to a urologist and be allowed to confer with her treating endocrinologist. *Id.* at pg. 3.

Hanson stated she was concerned that she might be developing diabetes due to the dietary issues she had to endure. *Plff's Ex.* 31 at pg. 3. She indicated she had maintained a diet low in carbohydrates for years to curtail the development of diabetes. *Id.* At some unspecified date, Hanson indicates she began receiving rice as a substitute for the breakfast oatmeal. *Id.* at pg. 4.

On February 12th, Hanson submitted a medical request complaining of severe urinary pain, edema in lower legs and ankles, and a broken tooth. *BCDC's Ex.* 2 at pg. 15. She told APN Norris she had an appointment with a private medical doctor scheduled. *Id.* He okayed her transport to the appointment. *Id.*

On February 20th, Hanson submitted a medical request complaining of a yeast infection, swelling in the legs, and severe pain from urinary problems. *BCDC's Ex.* 2 at pg. 16; *See also Tullis' Ex.* 3. On February 23rd, APN Norris noted Hanson had no edema in her extremities. *BCDC's Ex.* 2 at pg. 16. She was prescribed diflucan and doxepin. *Id.*

The medication logs indicate Hanson received the following medications:

Propylthiouracil, prescription for three tablets three times daily, was dispensed as follows:  9/25 (1); 9/26 (3); 9/27 (1); 10/1 to 10/8 (3); 10/12(2); 10/13-10/31 (3); 12/1-12/31(3); 1/1-3/31 (3);

Ciprofloxaon, prescription for one tablet twice daily--10/1-10/2 (2) & 10/3 (1); prescription for one tablet twice daily for seven days--10/27-10/31 (2);[2]

Cranberry Juice, prescription for twice daily-- 10/12-10/14 (1); 10/16 (1);10/17 (2); 10/18 (2); 10/19 (1); 10/21 (1); 10/22 (2); 10/23 (1); 10/25 (1); 10/27 (2); 10/28 (1);  prescription for three times daily--2/5 (1); 2/6-2/15 (3);

Banana, prescription for one daily--10/10 (1); 10/14 (1); and 10/15 (1);

Listerine, prescription for four times daily--10/1 (2); 10/2 (1); 10/12 (1); 10/14(1) and 10/18 (1);

Miconazole 7 Cream--October with notation given to Hanson for yeast;[3]

Oxybutynin, prescription for one each day--10/6-10/9 (1); 10/10-10/19 marked refused; 10/20 (1); 10/21-10/31 marked refused;

Levothyroxine, prescription for one tablet daily on Monday to Saturday and none on Sunday--10/1-10/8 (1); 10/13-10/17 (1); 10/19-10/31 (1); prescription changed to one tablet daily--12/1-1/29 (1), 1/31-2/31 (1);

Phenazopyridine, prescription for ½ a tablet three times a day, 10/1 (3);

Phenaxopyrid (presumably Phenazopyridine), prescription for one tablet, three times daily for three days--2/5 (1); 2/6-2/9 (2);[4]

Metronidazole, prescription one tablet, three times daily for seven days--2/2 (2); 2/3-2/4 (3); 2/5 (1); 2/6-2/14 (3) and 2/15 (2);[5]

SMZ-TMP, prescription one tablet twice daily for two days--2/5(1); 2/6-2/14 (2); and 2/15 (1);[6]

Anti-Nausea Liquid, prescription as needed up to four times daily--1/20 (1) & 1/24 (1);

---

[2] The year listed on this medication log is 2008.  It is not clear whether this is a mistake or if this medication was dispensed during a different incarceration.

[3] This record is dated 2008.

[4] This record is dated 2008.

[5] This record is dated 2008.

[6] This record is dated 2008.

Atenolol, prescription one tablet twice daily--12/11-2/20 (2); 2/21 (1); 2/22-3/31 (2);

Vitatrum multi-vitimans, prescription one tablet daily--12/14-12/26 (1); marked refused for the remainder of December; 1/1-1/2 (1); 1/4 (1); 1/6-1/16 (1); 1/18-1/30 (1); 2/3-3/31 (1);

Hydrocodone, prescription one tablet three times daily--12/16-12/31 (3);

Epsom Salts, prescription soak two times daily--11/14 (2); 11/15 (1); 11/18 (1); 11/19 (2); 11/21 (1); 11/31 (1); 1/5 (1); 1/8 (1);[7]

Omeprazole, prescription for one tablet daily--1/5-1/29 (1); 1/31-3/31 (1);

AZO, prescription for two tablets three times daily as needed--1/20 (2); 1/21 (3) and 1/25 (2);[8] and

Doxepin, prescription for one tablet daily--2/23-2/25 (1); 2/26-2/28 marked refused.

### *Conditions of Confinement*

Doneski states she repeatedly told Weaver that Hanson could not eat oatmeal or processed meats due to her allergy to nitrates and she was also sensitive to all legumes. *Plff's Ex.* 13. at ¶ 15. Doneski states Weaver told Hanson that no different diet would be provided and that she would have to purchase food from the jail commissary. *Id.* at ¶ 16. Doneski states that Dr. Phillip Hudson, an internal medicine physician, "explained to me that all of my daughter's adverse medical symptoms were related to her lengthy period of malnutrition during her incarceration." *Id.* at ¶ 23. Doneski states Dr. Hudson prescribed a very specific diet and she agreed to purchase all of the necessary foods, fruits, vegetables and bottled water and deliver them daily to the jail. *Id.* at ¶ 25.

---

[7] The November medication log is dated 2008.

[8] This record is dated 2009.

On June 30th, Hanson was given a prescription by Dr. C. Phillip Hudson for diet additions. *Plff's Ex.* 29. The additions were: chicken breast every other day, beef every other day, hard boiled egg daily, apple, pear, banana or grapes daily; broccoli, spinach, tomato, squash, or green beans daily. *Id.* There is no indication whether this document was furnished to the BCDC. *Id.* It indicates it was mailed to Hanson at her home address.

William Hanson, Plaintiff's husband, indicates he was incarcerated at the BCDC from November of 2009 until May 5, 2010. *Plff's Ex.* 14 at ¶ 3. When she does not have her thyroid medication, William Hanson states her neck swells tremendously, she experiences heart palpitations, and tremors. *Id.* at ¶ 6.

William Hanson states that while other inmates were allowed to visit their spouses, Weaver would not allow him to visit his wife. *Plff's Ex.* 14 at ¶ 8. William Hanson states the jail diet consisted of the same three meals every day. *Id.* at ¶ 9. They received oatmeal for breakfast, a bologna sandwich on white bread for lunch and a plate of beans for dinner. *Id.* He asserts his wife is allergic to oatmeal, cannot consume processed meats because of a nitrate allergy, doesn't consume pork because she is Jewish, and becomes ill when she eats beans. *Id.* at ¶ 9. He also indicates his wife had maintained a carbohydrate-restricted diet for ten years to keep her diabetes from worsening. *Id.* He states his wife's hair was falling out, she appeared weak and very thin, and did not have any facial color. *Id.* at ¶ 38.

With respect to her lack of privacy, William Hanson, who was housed in A-pod, states he could see his wife in the isolation cell next to the outside door to the recreation yard when the door to his housing unit opened. *Plff's Ex.* at ¶ 3. He indicates there was a large glass window to the isolation cell. *Id.* at ¶ 14. He could tell she was sick, had lost over twenty-five pounds,

-10-

and he could "see everything she was doing through the large glass window." *Id.* He states he became upset because all of the male inmates in his pod started "yelling at my wife and making obscene comments and saying lewd things about her anatomy." *Id.* at ¶ 15. He also states she could be seen by the males in B-pod as well as the trustees. *Id.* at ¶¶ 16-17. On one occasion a younger male inmate told "everyone in A-Pod that he saw my wife going to the bathroom and saw her 'tits.'" *Id.* at ¶ 23.

### *Religious Freedom*

In his affidavit, William Hanson, indicates that his wife is Jewish. *Plff's Ex.* 14 at ¶ 9. He also states that at the holidays his wife was upset because she was Jewish and knew she could not openly practice her religion due to the anti-Semitic environment in the jail. *Id.* at ¶ 31. He felt that if anyone found out his wife was Jewish things would be worse for her because he heard anti-Semitic comments every day, Nazi symbols were draw on the walls, and many inmates had Nazi tattoos. *Id.* at ¶ 32.

### *Grievances*

On September 29, 2009, Hanson submitted a grievance stating she "still" had not received her thyroid medication. *Tullis' Ex.* 4 at pg. 5; *Plff's Ex.* 3. Plaintiff has submitted a letter dated October 13th, authored by her attorney, John Russo, with the recipient listed as Lieutenant Randy Weaver. *Plff's Ex.* 4. The letter states he wanted to make Weaver aware of the fact that Hanson was not receiving proper medical care and treatment as ordered by her doctors and the jail's own medical provider. *Id.* Russo notes that Hanson ran out of her medication and was not provided with her thyroid medication. *Id.* He also states jail staff have

-11-

refused to provide her with liquids and food that Hanson's medical provider ordered. *Id.* This letter is marked "draft" and there is no indication whether it was sent or not. *Id.*

On October 21st, Hanson submitted a grievance stating she did not want APN Norris to give her a shot that would remove her toe nail. *Id.* at pg. 6. She stated she did not want her toe cut open at the jail due to staph microbes being present. *Id.* She stated she wanted to go to the hospital regarding her toe, to be tested for a blood infection, and to have her potassium levels checked. *Id.*

On October 30, 2009, Hanson submitted a grievance because APN Norris had discontinued her daily cranberry juice and banana. *Tullis' Ex.* 4 at pgs. 2-4. She complained that his discontinuation was based on a normal urinalysis. *Id.* She stated she suffered from a urinary problem that made it difficult for her to urinate and she noted Dr. Jackson had not discontinued her prescription. *Id.* She also complained she felt sick as a result of her infected toe. *Id.*; *see also Plff's Ex.* 10.

On December 9, 2009, Russo, in reply to an e-mail from Sheriff Montgomery, stated that his staff had reviewed Hanson's medication logs and they indicated Hanson had run out of medication. *Plff's Ex.* 15 at pg. 1. He also noted that if his client was receiving the same three meals every day that he would begin immediate proceedings to see that she got proper nutrition. *Id.*

That same day, Lou Marczuk, a public defender, e-mailed Sheriff Montgomery expressing concern for Hanson's medical condition. *Plff's Ex.* 15 at pg. 2. He noted that the ultra sound showed she had numerous tumors in her abdomen. *Id.* He noted APN Norris expressed concern that this could be ovarian cancer. *Id.*

-12-

Hanson submitted a grievance dated November 22nd complaining that all jailers did not allow her out of her cell to obtain her medication. *Tullis' Ex.* 4 at pg. 8. She stated inmates were still able to view the medication logs of other inmates. *Id.* She also complained she was not being allowed recreation time and was locked down in her cell twenty-four hours a day. *Id.* She stated that female inmates often yelled obscenities at her and made obscene gestures. *Id.*

In response, she was told it was up to the jailers how they dispensed medication; she was confined to an isolation cell because she was afraid other female inmates would hurt her; she was being allowed recreation time but when it was cold she was not allowed out in the yard; and, regardless of the threats being made toward her she was still physically separated from the other inmates so her safety was not an issue. *Tullis' Ex.* 4 at pg. 7.

On December 11th, Hanson submitted a grievance stating that she was experiencing excruciating back and abdominal pain and she wanted to request some type of heat pack or hot water bottle. *Tullis' Ex.* 4 at pg. 12. Hanson stated Jailers Fenwick and McMahon refused her request and also refused to call APN Norris. *Id.* Hanson indicates her request for an extra blanket was also denied as she had two blankets. *Id.* However, Hanson noted one was used to cover the soiled foam mat. *Id.* Later, Hanson indicates Jailer Tudor stated he would call APN Norris when he was done booking new inmates. *Id.*; *see also Plff's Ex.* 16.

On December 13th, Hanson submitted a grievance complaining that she was in pain from her ruptured ovarian mass and Jailer Fenwick had twice refused to contact Dr. Tullis stating she would not bother him on a weekend. *Tullis' Ex.* 4 at pg. 11. Hanson complained she had also been denied her prescription Listerine to help with her mouth sores. *Id.; see also Plff's Ex.* 17.

-13-

On December 15th, Russo wrote to Sheriff Montgomery. *Plff's Ex.* 18 at pg. 1. He asked for copies of all grievances, medication logs, medical records, the jail meal planning guide, and the jail policy and procedure manual. *Id.* Russo wrote to APN Norris asking for a complete copy of Hanson's medical records. *Id.* at pg. 2. Additionally, he asked for clarification of what actions had been taken to alleviate her abdominal pain. *Id.* Finally, Russo wrote to Dr. Tullis asking whether he was assuming care of Hanson and what his role was in her care and treatment. *Id.* at pg. 3. He noted Hanson had been complaining to APN Norris about abdominal pain since she first arrived at the jail. *Id.*

On December 31st, Hanson submitted a grievance complaining that she had not been allowed to shower for a week and as a result was getting a vaginal infection. *Tullis' Ex.* 4 at pg. 10. She noted she had been offered a shower on December 30th but had refused because it was after ten o'clock at night and "freezing cold" in her cell. *Id.* On the 31st, she states she was told by Jailer Tudor and Jailer McMahon that Lieutenant Weaver and Sergeant Elliott stated she would not be allowed to shower that day. *Id.*

In response, Hanson was told that a review indicated she had been refusing showers. *Tullis' Ex.* 4 at pg. 9. Lieutenant Weaver stated that inmates were allowed to shower "as we can get" to them. *Id.* With respect to the temperature, he noted the jail was 72˚ which was plenty warm enough to shower. *Id.*

On January 8th, Hanson wrote a letter to Lieutenant Weaver complaining about the "frigid cold temperature" in her cell. *Plff's Ex.* 20 at pg. 1. She stated she was shivering, suffering a headache from the cold, and barely able to hold a pencil. *Id.*

-14-

Notations are made that the temperature was checked in isolation cell one and the room temperature was 70˚ but the wall with the bunk was only 54˚. *Plff's Ex.* 20 at pg. 2. Hanson was moved to isolation cell two where the air temperature was 72˚ and the wall temperature was 69˚. *Id.*

On January 11th, Hanson wrote Lieutenant Weaver complaining that APN Norris had left instructions for her to receive Tylenol at all medication times but Jailers Altrazen, Burch, and Morrell were refusing to give it to her. *Plff's Ex.* 21 at pg. 1.

On February 10th, Hanson submitted a complaint about Dr. Tullis to the Arkansas State Medical Board. *Plff's Ex.* 24 at pg. 1. Despite having explained all her medical issues to Dr. Tullis, Hanson stated her medication regimen was not implemented causing her thyroid condition to worsen and continued abdominal pain. *Id.* at pg. 2.

On February 22nd, Hanson wrote Weaver a letter complaining that she was not allowed out of her cell at medication distribution times like other inmates were. *Plff's Ex.* 23. She also stated that she was being locked down twenty-four hours a day and not afforded any exercise. *Id.* She again complained that Jailer Burch and Altrazan were consistently refusing to provide her with Tylenol despite APN Norris' order for her to receive it on an as needed basis. *Id.*

On March 26th, Hanson wrote Lieutenant Weaver asking that she not be housed in a cell with Ramona Taylor. *Plff's Ex.* 25. Hanson noted Taylor acted very strangely and did not take her psychiatric medications properly. *Id.*

On April 22nd, Hanson submitted a document stating it was a medical necessity that they follow "this IC diet sheet." *Plff's Ex.* 26. The signature on this is illegible. *Id.*

-15-

With respect to her consumption of food, inmate comment reports contain the following: January 21, 2010, inmate received food tray but did not eat; January 23rd, inmate refused her tray last night and tonight; February 1st, inmate is to have broth for dinner and ice anytime she needs it; February 16th, inmate refused her breakfast, lunch, and dinner; February 23rd, inmate refused all meals; and April 22nd, refused a peanut butter sandwich but asked for biscuits and gravy.

### *Discrimination/Equal Protection*

According to William Hanson, male inmates were treated "much better" than female inmates. *Plff's Ex.* 14 at ¶ 41.  He indicates males received longer outside recreation time, were given newspapers each day, and were allowed razors and haircuts more frequently.  *Id.*

### 2.  Summary Judgment Standard

Summary judgment is appropriate if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In ruling on a summary judgment motion, the Court cannot weigh the evidence or resolve disputed  issues of fact in favor of the moving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

"[A] disputed fact alone will not defeat summary judgment, rather there must be a genuine issue of material fact.  To be material, a fact must affect the outcome of the suit under the governing law."  *Torgerson v. City of Rochester*, 643 F.3d 1031, 1052 (8th Cir. 2011)(internal quotation marks and citations omitted).

### 3.  Dr. Tullis' Motion for Summary Judgment (Docs. 43, 44 & 45)

Dr. Tullis maintains he is entitled to summary judgment in his favor because there is no evidence he was deliberately indifferent to Hanson's serious medical needs or that he discriminated against her.  As he is not involved in the control or management of the BCDC and

-16-

its employees, he maintains the other three counts of the complaint assert no claims against him.

### A. Discrimination/Violation of the Equal Protection Clause

Section 1981 "provides that all persons shall have the same right to 'make and enforce contracts' and the right to 'the enjoyment of all benefits, privileges, terms, and conditions of the contractual relationship.'" *Bediako v. Stein Mart, Inc.*, 354 F.3d 835, 839 (8th Cir. 2004)(quoting 42 U.S.C. § 1981(a)-(b)).

In asserting this claim, it appears Hanson is relying upon the Full-and-Equal Benefit clause of § 1981 rather than the Right-to-Contract clause.  To establish a prima facie case of discrimination under § 1981, Plaintiff must show that: (1) she is a member of a protected class; (2) the Defendants intended to discriminate on a constitutionally prohibited basis; and (3) that the discrimination interfered with a protected activity as defined in § 1981.  *Bediako v. Stein Mart, Inc.*, 354 F.3d at 839.

"While § 1981 prohibits racial discrimination in "all phases and incidents" of a contractual relationship, the statute does not provide a general cause of action for race discrimination." *Gregory v. Dillard's, Inc.*, 565 F.3d 464, 468 (8th Cir. 2009)(internal quotation marks and citations omitted).  Clearly, Hanson cannot establish Dr. Tullis subjected her to discrimination on the basis of her race.

Hanson's complaint can be read to assert an Equal Protection Claim.  "The Equal Protection Clause generally requires the government to treat similarly situated people alike." *Kilinger v. Dept of Corr.*, 31 F.3d 727, 731 (8th Cir. 1994)(citation omitted).  "The similarly situated inquiry focuses on whether the plaintiffs are similarly situated to another group for purposes of the challenged government action and so it is necessary to precisely define the claim

-17-

in order to determine what government action is being challenged." *Roubideauz v. North Dakota Dept. of Corrections and Rehabilitation*, 570 F.3d 966, 974 (8th Cir. 2009)(internal quotation marks and citation omitted). Here, Hanson's challenge is in connection with her conditions of confinement. Dr. Tullis was not involved with any decisions regarding her conditions of confinement.

### B.  Denial of Adequate Medical Treatment

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851(1998)(citation omitted). "Deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment as applied to the States by the Fourteenth Amendment." *Hartsfield v. Colburn*, 491 F.3d 394, 396 (8th Cir.  2007). In this circuit it is now settled law that deliberate indifference is the appropriate standard of culpability for all claims that detention center officials have denied inmates, whether in pretrial or convicted status, adequate medical care. *See Butler v. Fletcher*, 465 F.3d 340, 344 (8th Cir. 2006).

"In order to state a cognizable claim, a prisoner must allege acts or omissions sufficiently harmful to evidence deliberate indifference to serious medical needs." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). The deliberate indifference standard includes "both an objective and a subjective component:  'The [plaintiff] must demonstrate (1) that [she] suffered [from] objectively serious medical needs and (2) that the prison officials actually knew of but deliberately disregarded those needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir. 1997)). "For a claim of

AO72A
(Rev. 8/82)

deliberate indifference, the prisoner must show more than negligence, more even than gross negligence, and mere disagreement with treatment decisions does not rise to the level of a constitutional violation." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 498 (8th Cir. 2008).

Hanson alleged numerous problems with respect to her medical care including inadequate staffing, delays in responding to requests for medical care, delays in refilling prescriptions, errors or refusals to dispense prescription medication, and delays in obtaining specialty care. While it is true that Dr. Tullis arranged for Hanson to be taken to the hospital on four separate occasions, for numerous diagnostic tests to be done, and for her to be seen by a gynecologist, I believe there are genuine issues of material fact that preclude summary judgment in his favor. Hanson made repeated requests for medical care, stated she was in constant pain, and requested that she be sent to a urologist. At the same time, Hanson's mother was in contact with Dr. Tullis regarding her daughter's condition and her need for additional medical care. Under the circumstances, Hanson's claims against Dr. Tullis amount to more than a disagreement with her course of medical treatment. *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000).

### 4. BCDC's Motion for Summary Judgment (Doc. 46)

The BCDC Defendants contend they are entitled to summary judgment on each of Hanson's claims. With respect to the discrimination and freedom of religion claims, they maintain Hanson failed to exhaust her administrative remedies. Furthermore, they maintain there is absolutely no evidence that Hanson was discriminated against or in anyway prohibited from following the dictates of her religion. With respect to the denial of medical care claim, they maintain Hanson was provided with adequate medical care and merely disagrees with the care

-19-

she was given.  With respect to the unconstitutional conditions of confinement claims, they maintain no unconstitutional conditions of confinement exist.

### *A.  Discrimination/Violation of the Equal Protection Clause*

Defendants are entitled to summary judgment on these claims.  First, there is no evidence Defendants discriminated against Hanson on the basis of her race.  Second, with respect to the Equal Protection claim, Hanson was not similarly situated to another group for purposes of the challenged government action.  Hanson was in the isolation cell because she feared for her safety from other female inmates and also because she had various medical problems.  She has identified no group of similarly situated inmates who were treated differently.

### *B. Denial of Adequate Medical Treatment*

I believe there are genuine issues of material fact as to whether APN Norris, Sheriff Montgomery, and Lieutenant Weaver, exhibited deliberate indifference to Hanson's serious medical conditions.  APN Norris was responsible for the day to day provision of medical care to inmates.  He responded to medical requests and apparently determined whether Dr. Tullis would be consulted.

While supervisors cannot be held liable on a theory of *respondeat superior*, they may be held liable if they knew the prisoner's "serious medical needs were not being adequately treated yet remain indifferent."  *Langford v. Norris*, 614 F.3d 445, 460 (8th Cir. July 20, 2010)(citation omitted).  Sheriff Montgomery and Lieutenant Weaver both had personal knowledge regarding Hanson's serious medical needs and her complaints of inadequate treatment.

Similarly, I believe there are issues of fact as to whether the County's policies, or lack thereof, caused, or contributed to, the alleged inadequacies and delay in the provision of medical

care and prescription medications.  County policy, in regard to the care and custody of detainees, is, of course, established by the Sheriff.  Ark. Code Ann. § 12-41-502 (Supp. 2010)("The county sheriff of each county in this state shall have the custody, rule, and charge of the jail within his or her county and all prisoners committed in his or her county, and he or she may appoint a jailer for whose conduct he or she shall be responsible.").

Finally, Hanson maintains Jailers Fenwick, McMahon, Altrazan, and Burch all refused her medical care or refused to dispense her prescription medications.  Based on this, there are genuine issues of material fact as to whether these jailers denied Hanson medical care.

### C.  Unconstitutional Conditions of Confinement

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being."  *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted).  The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones.  *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment.  U.S. Const. amend. VIII.   The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime."  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).   Prison conditions claims include threats to an inmate's health and safety.  *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

Hanson maintains her conditions of confinement were unconstitutional because she was denied out of cell exercise, denied exposure to natural light, and denied an adequate diet.  A

-21-

constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992).   A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.*  Among factors the court should consider in reviewing such a claim are:  (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement.  *Id.*

Here, Hanson maintains she spent six to eight months in an isolation cell.  She contends she was only occasionally allowed out of her cell and then exercise opportunities were limited.  As a result of the lack of exercise and exposure to natural light, she maintains her health was adversely impacted.

It has been recognized that "short-term denials of exercise may be inevitable in the prison context." *See Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001); *see* also *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody).  Defendants have provided no affidavits or other documents that indicate what exercise opportunities were available to Hanson or what opportunities she had to be out of her cell.  I believe a genuine issue of material fact exists that precludes summary judgment in Defendants' favor on this claim.

Next, Hanson claims she was denied a diet adequate to maintain her health.  She asserts that the meals served each day did not vary and consisted of oatmeal for breakfast, a bologna

sandwich on white bread for lunch, and beans and cornbread for supper. The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). To prevail on an Eighth Amendment claim, Hanson must show the Defendants were deliberately indifferent to her dietary needs. *Wishon*, 978 F.2d at 449.

Merely because the food served is not prepared to an inmate's taste does not implicate the Eighth Amendment. Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health. *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food); *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

In this case, I believe there are genuine issues of material fact that preclude summary judgment in Sheriff Montgomery's and Lieutenant Weaver's favor. There is nothing before the Court to suggest what steps are utilized to ensure the meals served at the BCDC provided a balanced diet or that the meals served Hanson were consistent with her dietary restrictions. Defendants have provided no affidavits or other evidence regarding the preparation of the meals served at the BCDC, the menu used, variations from the menu, or the maintenance of a uniform serving size. Defendants are not entitled to summary judgment on this claim.

-23-

### **D.  Privacy Rights**

Although Hanson has grouped her privacy claim in with her unconstitutional conditions of confinement claim, I believe it should be addressed separately because the right to privacy is generally regarding as arising under the Fourth Amendment.  *See e.g., Cornwell v. Dahlberg*, 963 F.2d 912, 916 (6th Cir. 1992).  "[A] prison inmate has a far lower expectation of privacy than do most other individuals in society," *Goff v. Nix*, 83 F.2d 358, 365 (8th Cir. 1986), and retains "very narrow zones of privacy," *Hill v. McKinley*, 311 F.3d 899, 905 (8th Cir. 2002).  "[A] prisoner's Fourth Amendment privacy rights are not violated" when a male guard requires a female inmate to disrobe.  *Id.* at 903.  Similarly, "[s]urveillance of  male inmates by female guards, including observation of them in the bathroom and shower, was not unreasonable . . . when "the sex-neutral practice neither impermissibly violated the inmates' privacy nor the guards' equal opportunity rights." *Booker v. City of St. Louis*, 309 F.3d 464, 468 (8th Cir. 2002).

In determining whether Hanson's privacy interests have been violated, the Court must consider the factors outline in *Turner v. Safley*, 482 U.S. 78 (1987).  In *Turner,* the Court held that a prison "regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89.  The Court is to weigh the following four factors:  (1) whether a valid, rational connection exists between the regulation and the penological interest offered to justify it; (2) whether the inmate has an alternative means of protecting the right; (3) whether accommodation of the right would significantly affect prison resources; and (4) whether there is an obvious, simple alternative to the challenged regulation.  *Id.* at 89-90.

-24-

If Hanson were merely being viewed by prison guards in the course of their duties, her privacy claim would undoubtedly fail.  However, in this case, Hanson maintains she had to dress and undress and use the toilet in view of guards of the opposite sex, inmates of the opposite sex, and civilian visitors of the opposite sex.  Defendants have not provided the Court with sufficient information in support of there summary judgment to allow the Court to weigh the applicable factors.  Defendants are not entitled to summary judgment on this claim.

### E. Freedom of Religion

"Prison walls do not form a barrier separating prison inmates from the protections of the Constitution."  *Turner v. Safley*, 482 U.S. 78, 84 (1987).  "Inmates clearly retain protections afforded by the First Amendment, including its directive that no law shall prohibit the free exercise of religion."  *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987); *see also Cruz v. Beto*, 405 U.S. 319 (1972).

This right, however, is not without limitation.  The Supreme Court has recognized that "incarceration brings about the necessary withdrawal or limitation of many privileges and rights."  *O'Lone*, 482 U.S. at 348.   "The free exercise right is limited insofar as a prisoner's adherence to religious practices may be regulated by prison authorities, so long as such regulations are' reasonably related to legitimate penological interests.'"  *Murphy v. Carroll*, 202 F. Supp. 2d 421, 424 (D. Md. 2002)*(quoting Turner*, 482 U.S. at 89; *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348-349 (1987); *Cruz*, 405 U.S. at 322)); *see also Thomas v. Gunter*, 32 F.3d 1258, 1259-60 (8th Cir. 1994).  "A prisoner need not be afforded his preferred means of

-25-

practicing his religion as long as he is afforded sufficient means to do so." *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004).

In analyzing a First Amendment free exercise claim, the court first addresses the "threshold issue of whether the challenged governmental action 'infringes upon a sincerely held religious belief,' and then appl[ies] the *Turner* factors to determine if the regulation restricting the religious practice is 'reasonably related to legitimate penological objectives.'" *Murphy v. Missouri Department of Corrections*, 372 F.3d 979, 983 (8th Cir. 2004). "Prison regulations that infringe on the constitutional rights of prisoners are judged by their reasonableness. Prison officials are not required to choose the least restrictive means possible in furthering administrative interests." *Salaam v. Lockhart*, 905 F.2d 1168, 1171 (8th Cir. 1990).

In *Turner v. Safely*, 482 U.S. 78, 89-90 (1987), the Court set forth a reasonableness test consisting of four factors used to balance an inmate's free exercise right and the prison's legitimate correctional goals and security concerns. Specifically, the court considers: (1) whether there exists a rational connection between the prison policy or regulation and a legitimate governmental interest advanced as its justification; (2) whether there are alternative means of exercising the right notwithstanding the policy or regulation; (3) what effect accommodating the exercise of the right would have on guards, other prisoners, and prison resources generally; and (4) whether there are ready, easy-to-implement alternatives that would accommodate the prisoner's rights. *Turner*, 482 U.S. at 89-91.

William Hanson's affidavit is the only mention of his wife's religious beliefs contained in any of the materials submitted to the Court. There is nothing suggesting she asked for a

-26-

religious diet or that she was prevented in anyway from following the dictates of her religion. In fact, there is nothing to suggest the Defendants were even aware of Hanson's religious beliefs. Defendants are therefore entitled to summary judgment on this claim.

### *F. Other Named Defendants*

Hanson has named Chief Deputy Jeff Louis, Sergeant Edward Elliott, Corporal Linda Henry, Jailer Heather Easter, Jailer Sherry Lewis, Jailer Patrick Gault; Jailer James Tudor, and Jailer Sonya Olnay as Defendants.   Hanson's claims that these jailers were verbally abusive to her,  or taunted her, or threatened her, do not state claims of constitutional dimension. *McDowell v. Jones*, 990 F.2d 433, 434 (8th Cir. 1993)(inmate's claims of general harassment and of verbal harassment were not actionable under § 1983); *O'Donnell v. Thomas*, 826 F.2d 788, 790 (8th Cir. 1987)(verbal threats and abuse by jail officials did not rise to the level of a constitutional violation); *Martin*, 780 F.2d at 1338-1339 (being called an obscene name and threatened with adverse consequences unless he cut his hair and shaved does not state a claim of constitutional dimension); *Black Spotted Horse v. Else*, 767 F.2d 516, 517 (8th Cir. 1985)(use of racially offensive language in dealing with a prisoner does not, by itself, state a claim).

Furthermore, "[l]iability for damages for a federal constitutional tort is personal, so each defendant's conduct must be independently assessed." *Heartland Academy Community Church v. Waddle*, 595 F.3d 798, 805-06 (8th Cir. 2010).  Hanson has made only the most general allegations regarding these Defendants.  There is no indication they were involved in deciding what type of medical care Hanson should be provided, or in determining where she should be

-27-

housed, or in the preparation of meals or menu planning, or in deciding when, or if, inmates should be given recreation time.

### G.  Qualified Immunity

The BCDC Defendants make a blanket argument that they are entitled to qualified immunity.  They do not address the various claims separately.

The qualified immunity "inquiry comes down to two questions: (1) whether the facts alleged or shown, construed in the light most favorable to [the plaintiff], establish a violation of a constitutional ... right, and (2) whether that constitutional right was clearly established as of [the time of the relevant conduct], such that a reasonable official would have known that his actions were unlawful."  *Langford v. Norris*, 614 F.3d 445, 459 (8th Cir. 2010) (internal quotations and citation omitted).

It is clearly established that inmates are entitled under the Eighth Amendment to care for their serious medical needs.  *Moore v. Duggy*, 255 F.3d 543, 545 (8th Cir. 2001).  Deliberate indifference may be shown, among other ways, by medical treatment that deviates from the applicable standard of care, by delays in medical care, and by the refusal to provide medical care. It is also clearly establish that the Constitution prohibits the imposition of inhumane conditions of confinement on inmates.  *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981).  Without doubt, the Constitution is violated if inmates are provided a diet inadequate to maintain their health or not afforded opportunities to exercise.  *See supra cases cited* at pgs. 21-24.  Finally, it is clearly established that inmates retain some measure of privacy and that continual exposure to the

opposite sex on the basis alleged by Hanson would violate that right. *See supra cases cited* at pgs. 24-25.

In this case, I believe Hanson has alleged the deprivation of recognized constitutional rights, that these rights were clearly established, and that outstanding questions of fact preclude summary judgment at this time on the ground of qualified immunity. *Davis v. Hall*, 375 F.3d 703, 712 ( 8th Cir. 2004).

**5. Conclusion**

For the reasons stated, I recommend that the motion for summary judgment (Doc. 43) filed by Dr. Tullis be granted in part and denied in part. Specifically, I recommend it be granted with respect to the discrimination and Equal Protection claims and denied with respect to the medical care claim.

Further, I recommend that the summary judgment motion (Doc. 46) filed by the BCDC Defendants be granted in part and denied in part. Specifically, I recommend the motion be granted with respect to the discrimination, Equal Protection, and Freedom of Religion claims. I recommend the motion be denied with respect to the medical care claim, the unconstitutional conditions of confinement (diet and exercise) claims, and the right to privacy claims. Finally, I recommend that all claims against the following Defendants be dismissed: Chief Deputy Jeff Louis, Sergeant Edward Elliott, Corporal Linda Henry, Jailer Heather Easter, Jailer Sherry Lewis, Jailer Patrick Gault; Jailer James Tudor, and Jailer Sonya Olnay.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1). The failure to file timely objections may result in waiver of the right to appeal questions of fact. The parties**

-29-

**are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 2nd day of September 2011.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)