IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
HARRISON DIVISION

TAMMY CHRISTINE HANSON                                        PLAINTIFF

     v.                              Civil No. 10-3022

BAXTER COUNTY, ARKANSAS;
SHERIFF JOHN MONTGOMERY;
LIEUTENANT RANDALL WEAVER;
DR. JOSEPH TULLIS; WILTON
"CHIP" NORRIS; JAILER HELEN FENWICK;
JAILER TONY BECK; JAILER WILLIAM
ALTRAZAN; and JAILER GARNETT McMAHON                         DEFENDANTS

## **REPORT AND RECOMMENDATION OF THE MAGISTRATE JUDGE**

This is a civil rights action filed by the Plaintiff, Tammy Christine Hanson (Hanson),

under the provisions of 42 U.S.C. § 1983.  Hanson proceeds *pro se* and *in forma pauperis.*

At the times relevant to this case, Hanson was incarcerated in the Baxter County

Detention Center (BCDC).  She maintains her constitutional rights were violated in a variety of

ways.  On motions for summary judgment several claims were dismissed as well as multiple

parties (Doc. 61).  The claims that remain to be heard are:  (1) denial of adequate medical care;

(2) she was subjected to unconstitutional conditions of confinement; and (3) violation of her right

to privacy.

Hanson has made a demand for a jury trial.  For this reason, the case was scheduled for

an evidentiary hearing to determine if there were issues triable to a jury.  The case was heard on

February 21-22, 2012 and August 15, 2012.  The testimony of the following witnesses was

heard: (1) Llewellyn Marczuk; (2) Teresa Krug; (3) Tracy Standridge; (4) John Marshal; (5)

Ashley Tharp; (6) Samuel Noakes; (7) Joe Bodenhamer; (8) Sherry Lewis; (9) William Altazan;

(10) Tony Beck; (11) Helen Fenwick; (12) Randall Weaver; (13) Joseph Tullis; (14) Linda

Henryk; (15) John Montgomery; and (16) Wilton "Chip" Norris. The Court was unable to get

all the evidence in so a supplemental hearing was held on August 15, 2012.  The testimony of

the following witnesses was heard: (17) Christine Doneski; and (18) Tammy Hanson. At the

conclusion of the August 15th hearing, the record remained open for the submission of additional

discovery into evidence.  No additional evidence has been submitted and the case is ready for

review.  The Court will not attempt to summarize all the testimony and exhibits.  Instead, the

Court will discuss the testimony and exhibits as relevant to each claim.

### 1.  Applicable Standard

A jury demand has been made in this case.  A pretrial evidentiary hearing may be utilized

to determine "whether the evidence presents a sufficient disagreement to require submission to

a jury or whether it is so one-sided that one party must prevail as a matter of law." *Johnson v.*

*Bi–State Justice Center*, 12 F.3d 133, 135 (8th Cir. 1993)(*quoting Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 251-52 (1986)).  When both sides present evidence, the procedure "resembles

a summary judgment motion with live evidence." *Id.*  The Court must avoid credibility

determinations, believe Hanson's evidence, and draw all justifiable inferences in the Hanson's

favor. *Id*. at 136.

### 2.  Discussion

Hanson was booked into the BCDC on September 25, 2009, on a misdemeanor failure

to appear charge in answer to a citation of cruelty to animals.   The warrant was served on

Hanson by Defendant Tony Beck (Beck).  Hanson remained incarcerated until July 10, 2010.

### (A).  Denial of Adequate Medical Care

To prevail on an Eighth Amendment claim, Hanson must prove that Defendants acted

with deliberate indifference to her serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 106

(1976). The deliberate indifference standard includes "both an objective and a subjective

component: 'The [plaintiff] must demonstrate (1) that [she] suffered [from] objectively serious

medical needs and (2) that the prison officials actually knew of but deliberately disregarded those

-2-

needs.'" *Jolly v. Knudsen*, 205 F.3d 1094, 1096 (8th Cir. 2000)(*quoting Dulany v. Carnahan*, 132 F.3d 1234, 1239 (8th Cir.1997)).

"For a claim of deliberate indifference, the prisoner must show more than negligence, more even that gross negligence, and mere disagreement with treatment decisions does not give rise to the level of a constitutional violation.  Deliberate indifference is akin to criminal recklessness, which demands more than negligent misconduct." *Popoalii v. Correctional Medical Services*, 512 F.3d 488, 499 (8th Cir. 2008)(internal quotation marks and citations omitted).

Hanson testified she has two thyroid[1] conditions--Graves' disease[2] and Hashimoto's disease.[3]  The diseases had been managed for a number of years with medication.  Prior to her incarceration, Hanson had an elevated CA125 blood test.  This test is used to measure a substance produced by tumor cells.  Hanson testified she had been told she possibly had ovarian cancer and would need to undergo surgery and chemotherapy.  Her thyroid conditions were being managed by Dr. Robert J. McConnell, an endocrinologist in New York.

When she was transported to the BCDC, she had her two thyroid medications, propylthiouracil (PTU) and levothyroxin, vaginal ointment, and a bottle of Listerine with her.  When she arrived at the jail, the transporting officer gave the medication to Beck and told him that he would need to contact medical jail staff.

For the first three or four days, Hanson testified she asked for the medication and was told she would need to talk to Lieutenant Randall Weaver (Weaver).  According to Hanson, her

---

[1] The "thyroid is a butterfly-shaped gland in [the] neck."  It is an endocrine gland and produces hormones.  http://www.nlm.nih.gov/medlineplus/thyroiddiseases.html (Accessed January 31, 2013).

[2] "Graves' disease is an immune system disorder that results in the overproduction of thyroid hormones."  http://www.mayoclinic.com/health/graves-disease/DS00181 (Accessed January 31, 2013).

[3] "Hashimoto's disease is a disorder that affects your thyroid.. . .  In Hashimoto's disease, also known as chronic lymphocytic thyrodities, [the] immune system attacks [the] thyroid gland.  The resulting inflammation often leads to an underactive thyroid gland (hypothyroisism.)" http://www.mayoclinic.com/health/hashimotos-disease/DS00567 (Accessed January 31, 2013).

AO72A
(Rev. 8/82)

Mother, Christine Doneski (Doneski) hired John Russo (Russo), an attorney, to, among other things, help get Hanson her medication. Russo had a letter from Dr. McConnell, *see discussion supra*. Hanson testified that Russo advised her that he had made the jail staff aware of the letter.

When she does not get her medication, Hanson testified her thyroid swells and presses on her throat making it difficult to talk. After her attorney intervened, Hanson stated that she started receiving her medication.

Hanson testified that the administration of medication was subject to inconsistencies. She indicated that medication was passed out at the jailers' convenience and was not on a set schedule. With respect to the medication logs, Hanson testified that some jailers brought the logs for the inmates to initial and others did not. At some point, she indicated she was asked to go back and initial old logs. She refused and started keeping her own medication log. *Plaintiff's Exhibit* (hereinafter *Plff's Ex.*) 27.

By letter dated September 15th, Dr. McConnell indicated Hanson, due to fluctuating thyroid hormone blood levels, had been taking a combination of the antithyroid drug propylthiourcil and thyroid hormone. *Plff's Ex.* 26 at pg. 1. Dr. McConnell wrote that "[b]ecause of the nature of her disorder, it is of great importance that she takes her medication at regular intervals and be periodically monitored for response." *Id.* He noted that "[s]kipping the antithyroid medication could lead to a severe exacerbation of her hyperthyroidism, which could be life threatening, especially since she is also taking thyroid hormone." *Id.*

With respect to Chip Norris (Norris), an Advanced Practice Nurse, Hanson she was not seen by him until several weeks after her incarceration. In fact, she indicated her first visit to him was in connection to an ingrown toenail. She testified she refused to allow him to do a wedge resection. Hanson feared that she would get an infection if the procedure was done.

-4-

In December, Hanson testified she was in "horrible pain" when ovarian cysts ruptured. She indicated she was vomiting and bleeding.  Dr. Tullis and Norris were aware of how painful it was and narcotic pain medication was prescribed for Hanson.  However, initially she testified she received no care and had nothing to relieve the pain.

Hanson testified she continually asked to go to a urologist and an endocrinologist.  When she could not get Defendants to help, Hanson testified she resorted to filing this lawsuit.

Llewellyn Marczuk (Marczuk), an attorney, testified that he represented Hanson from March 18, 2010, until July 10, 2010.  However, he indicated he had contact with the Hanson both before and after these dates.  With respect to her medical care, he testified he made contact with the Sheriff's Office regarding Hanson's need for medical care.  With the medical issues Hanson had, Marczuk indicated Hanson needed to be under the care of a medical expert.  He also filed a motion for Hanson to be afforded medical treatment in Hanson's state criminal cases and was asked by Judge Webb, the state court judge presiding over Hanson's criminal case, to assist in obtaining her treatment.  He believed that Hanson had difficulty obtaining medical treatment to a certain degree.  Part of this was due, he believed, to Hanson's having  alienated the local medical community.  In fact, he stated that Hanson was "infamous" and her crime affected the willingness of others to get involved with her.[4]

Marczuk requested that Hanson be released on her own recognize to, among other things, seek medical treatment.  In his experience, the inmate's "loved ones" often participated in setting up medical or dental treatment.   In this instance, he indicated that Hanson's Mother was involved.

He also testified that on one occasion he took photographs of Hanson's swollen legs.  He contacted Weaver about the situation and believed Hanson was taken to the emergency room that

[4]Hanson was found guilty of twenty counts of cruelty to animals.  *BCDC Ex.* 1.

day.  Marczuk did not believe there had been any deliberate indifference to Hanson's serious

medical needs.  He also testified that Dr. Tullis did not interfere with the Hanson's medical

treatment.

Marczuk testified that Hanson was twice taken to Little Rock to see doctors.  On the first

occasion Marczuk testified she was seen by two doctors and on the second occasion was seen

by Dr. P. Hudson.

Sheriff Montgomery also testified that he recalled getting emails and letters from

Hanson's attorney, Russo, regarding her medical care and asking for certain medical treatments.

*See Plff's Ex.* 26. If the communication was addressed to him, Sheriff Montgomery stated he

would have turned the information over to the jail administrator and told him to comply.

Sheriff Montgomery testified that he had a confrontation with Russo in the courtroom.

Russo was attempting to get the judge to order proper medical treatment for Hanson.  Sheriff

Montgomery indicated he checked with jail staff and was informed that Hanson was receiving

proper treatment.

Sheriff Montgomery also testified that he had spoken with Doneski.  He indicated that

he discussed Hanson's medical care numerous times with Dr. Tullis and Norris.  Sherif

Montgomery testified he did not attempt to influence them.  He indicated he had never refused

to provide medical treatment because of the costs.  However, he did object to the Hanson being

taken to Little Rock for medical treatment since she had already underwent expensive testing.

Judge Webb ordered the jail to transport her to Little Rock so long as her family would pay for

it.

Beck, a former jailer, testified that medication call was done four times a day at 6:00

a.m., noon, 6 p.m. and 10 p.m.  He recalled that Hanson put in many medical requests and

grievance forms.

-6-

Former Jailer Helen Fenwick (Fenwick) testified that when Hanson asked for medical treatment she either contacted her supervisor or called Dr. Tullis or Norris. In December of 2009, Fenwick recalled Hanson being in so much pain from a ruptured ovarian cyst that she could not lay down. Fenwick contacted both Dr. Tullis and Norris. She was told it was not an emergency situation. On December 13th, Fenwick testified she was informed by Dr. Tullis that the pain would continue for forty-eight to seventy-two hours.

Joe Bodenhamer, the County Judge in 2009 and 2010, testified the Quorum Court had no power over the jail administration. However, he testified that the Quorum Court did set the budget. If the BCDC exceeds its budget, Bodenhamer testified that a clean up ordinance would be done in March to move money around to make up for the overrun. He knew the BCDC had exceeded the line item for medical care in both 2009 and 2010. Bodenhamer was also aware of the fact that the Sheriff had asked for inmates to be released because of medical expenses.

According to Weaver, unless an inmate had a serious medical condition he would respond to grievances within seven days. If a serious condition existed, either Dr. Tullis or Norris would be contacted. If an emergency existed, the inmate would be sent to the emergency room.

Weaver testified that Dr. Tullis is the facility doctor and a reserve deputy who donates his time and services to the jail. However, Weaver testified that Dr. Tullis is not responsible for medication administration or any other aspect of the jail administration. Weaver testified that Norris was on a pay scale of some kind. When a medical request was submitted Norris was called, and a triage was done over the phone. Norris would visit the jail after working hours.

With respect to the medical questionnaires, Weaver stated that it was the booking officers duty to fill them out. The doctor's name, what illnesses an inmate had, and what provisions needed to be made were all to be entered on the medical questionnaire. The medication logs consist of single sheets of paper that are hole punched and placed in a binder. Officers have been

-7-

suspended for not filling the logs in.  Some of Hanson's medication logs were missing and others showed that the medication was not administered on the prescribed basis.  *BCDC's Ex.* 8.

While Hanson did have access to a phone, Weaver testified he did not allow her to phone her doctor in New York.  Instead, Dr. Tullis and Norris were going to contact the New York doctor.  Hanson was free to contact him by mail or through others.  Although Hanson believed she had ovarian cancer, Weaver testified that Dr. Tullis and Norris established that she did not have cancer.  Weaver never discussed the thyroid issue with Hanson but had been advised by Dr. Tullis or Norris that she had a thyroid condition and was taking medication for it.  He assumed the medication was taking care of the condition.

Teresa Krug (Krug), a former inmate,  testified that Hanson wasn't a "standard prisoner" because she had a lot of health problems and wanted special treatment such as being provided juice and bananas.  Hanson was in the C block with Krug for three or four weeks.  In December of 2009, Krug witnessed Hanson being sick and in pain for several hours before she was taken to the hospital.  Krug attempted to get help from jail personal.  She repeatedly pushed the emergency button and told them Hanson was very sick.

When Hanson was booked in, an inmate medical form was completed.  *BCDC's  Ex.* 2 at pg. 1.  The form consists of six questions.  *Id.*  It indicates Hanson has "several illnesses," is on "several meds," and is under a doctor's care.  *Id.*  No other information appears on the form.  *Id.*  A second inmate medical form was completed on November 4, 2009.  *Id.* at pg. 5.  This form contains the following notations:  "thiroid noverian cancer synthryold ptu dr mccoonnell dr herzog."  *Id.*  A third inmate medical form was completed on January 6, 2010.  *BCDC's Ex.* 2 at pg. 12.  This form indicates Hanson has thyroid disease and ovarian cancer.  *Id.*  It also indicates she is taking PTU, levothyroxine, atenolol, Prilosec, and vitamins and is under the care of "Dr. Ocanal and Dr. Ersog and Chip Norris."  *Id.*

-8-

Doneski testified that Hanson had the thyroid condition for years. Prior to her incarceration, Doneski testified Hanson had not had problems with a swollen neck, swelling of the legs, urinary tract infections, or gynecological problems. Doneski admitted, however, that she had not seen her daughter for four or five years prior to her being extradited to Boone County.

While Hanson was in the BCDC, Doneski testified that, with the exception of Dr. Tullis and Norris, she had to pay for all the Hanson's doctor visits. Funds were deducted from Hanson's inmate account when she was seen by Dr. Tullis or Norris. With respect to her thyroid condition, Doneski indicated that Hanson wanted to continue to have her condition followed by Dr. McConnell in New York. Dr. Tullis offered to coordinate her care.

Doneski testified that Hanson advised her that she was not receiving her medication and could possibly go into a thyroid storm.[5] Doneski stated she talked to Sheriff Montgomery and Weaver about Hanson's medical condition and recalled speaking with Sheriff Montgomery once about trying to get Hanson released on an ankle monitor.

Norris testified he is a licensed family nurse practitioner and can assess, diagnose, and treat patients in collaboration with a doctor. He can also prescribe medication.

In 2009 and 2010, Norris was employed by the BCDC on a part-time basis. Prior to this, he indicated the only treatment provided to inmates was at the emergency room.

Norris had no set schedule for visiting inmates. If there was an urgent matter, jail staff would contact him and he would go to the BCDC that day. If he was contacted about a condition that was non-urgent he typically didn't go to the BCDC until the next day. He normally visited the jail after he had worked at his "regular job."

He recalled Hanson having urinary tract issues. He believed her pain was from cysts which caused inflammation that can be very painful. He diagnosed her with interstitial cystitis

---

[5]"Thyroid storm is a life-threatening condition that develops in cases of untreated thyrotoxicosis (hyperthyroidism or overactive thyroid)." http://www.nlm.nih.gov/medlineplus/ency/article/000400.htm (Accessed February 5, 2013).

-9-

by a process of elimination. He testified this is a fairly common condition and people with the condition do not take medication for it. He did not regard this condition as emergent or life threatening.   According to Norris, unless a medical request was made, he was not contacted by jail staff if an inmate came in with prescriptions. Instead, he would be notified when the prescription was going to run out. On other occasions, he would be contacted by the pharmacy.

On September 29, 2009, Norris ordered Hanson's thyroid medication. He indicated she was kept on her thyroid medication the entire time she was in the BCDC.

Norris testified he had nothing to do with, and was not familiar with, the medication logs kept by the BCDC.   He does nothing to ensure the prescribed medication is obtained or dispensed. However, he later testified that if he received a complaint that an inmate was not receiving his medication, he would ask to see the medication and count the pills. If the inmate was not receiving his medication, Norris testified he would talked to Weaver who would inform the jailers. Norris could not recall Hanson complaining about not getting her medication.

In March of 2010, Norris quit seeing Hanson. He testified that he has to have a supervising collaborative agreement. Therefore, when Dr. Tullis quit seeing a patient, Norris could no longer see the patient.

Norris saw Hanson for the first time on October 19, 2009, for an ingrown toenail and a possible yeast infection. *BCDC's Ex.* 2 at pg. 3. He offered to perform a wedge resection. At this visit, Norris testified that Hanson did not mention ovarian cancer or her thyroid condition.

Norris next saw Hanson on October 26th when she complained of an infected toe and bladder pain. He observed no indication of infection on the toe but did prescribe antibiotics. He also sent her to the hospital for a urinalysis and to have her potassium level checked. *BCDC's Ex.* 2 at pg. 4. The tests came back negative.

-10-

On November 13th, he authorized Epsom salt and stated it was "ok" for family to bring in cranberry juice for Hanson. *BCDC's Ex.* 2 at pg. 6. Norris testified Hanson did not bring up any other medical complaints.

On December 10th, Norris met with Hanson to review the results of tests Dr. Tullis had ordered. *BCDC's Ex.* 2 at pg. 7. The tests showed she had a pelvic mass, hypothyroidism, and high blood pressure. *Id.* To avoid the possibility of a thyroid storm, Norris testified Hanson was prescribed a beta blocker. She was also prescribed a narcotic pain medication. At this point in time, Norris testified she had advised them that she had been scheduled for chemotherapy and surgery.

He next saw Hanson on December 27th. She had been complaining of vomiting, it being cold in the cell, and asking for something different for breakfast. She had normal vital signs, no temperature, and a normal examination.

On January 4, 2010, she was seen complaining of a vaginal infection and bladder and abdominal pain. *BCDC's Ex.* 2 at pg. 10. Norris noted that Hanson did not tolerate narcotic pain medication. She had underwent an ultrasound that showed more than one ovarian cyst had ruptured.

On February 16th, Norris okayed Hanson being transported to a private physician. *BDCD's Ex.* 2 at pg. 15. He noted that Hanson had already scheduled the appointment. *Id.*

On February 22nd, Hanson put in a medical request complaining of a yeast infection, swelling of her legs, urinary problems, and severe pain. *BCDC's Ex.* 2 at pg. 16. Norris prescribed fluconazole for the yeast infection and doxepin for possible interstitial cystitis. *Id.*

In total, Norris testified that Hanson was seen on eight different occasions and on none of these occasions did she complain of not receiving her medication. Norris testified that Hanson had been "worked up" for cancer in the "extreme." She had extensive laboratory work, more than one ultra sound, CT scans, and a biopsy. All tests were negative. Following her visit to

-11-

the urologist in Little Rock, Norris testified that Plaintiff refused to take the three prescribed medications.

Dr. Tullis testified he is a board certified radiologist with a limited general practice and a part-time deputy. Dr. Tullis stated that he did not do primary practice at the jail. Instead, he asserted that was left to Norris. Dr. Tullis indicated Norris also wrote most of the prescriptions. Dr. Tullis acted as Norris' supervising physician in connection with the BCDC.

Dr. Tullis testified that he had nothing to do with the day to day running of the jail and this included the dispensing of prescribed medication and the diet provided inmates. He was unaware of the fact that Hanson's thyroid medication was not being dispensed to her. In fact, he believed he had spoken with someone at the jail about the necessity of her being continued on her PTU medication. In Dr. Tullis's opinion, Hanson received more medication than any other inmate or for that matter "doctor's wife." He described her as a difficult patient.

Dr. Tullis also believed that he talked to Weaver about the dietary issues Plaintiff was having and the fact she was allergic to certain things. In response, Weaver pointed out that there was a garden at the jail and the vegetables it produced were available to inmates. Sheriff Montgomery testified the fresh vegetables produced are put on as part of the menu.

Dr. Tullis had no office at the jail. He testified he did not perform initial assessments and did not see what medical conditions were listed by inmates when booked.

Dr. Tullis did on occasion transport inmates to the hospital for diagnostic testing. If the testing indicated the inmate needed more care, he referred the inmate to the emergency room or a family practice physician. While he held the title of medical care coordinator, he testified it was purely an honorary title.

Dr. Tullis testified he talked to two different urologists about Hanson's case one of whom advised that Hanson be taken to the University of Arkansas for Medical Sciences (UAMS) in

-12-

Little Rock, Arkansas.  While Hanson had multiple urinalyses, they did not show any abnormal findings.

With respect to her thyroid condition, Dr. Tullis testified he offered to treat Hanson for free with radio iodine therapy or take her to an endocrinologist.  Hanson refused indicating she wanted to continue being treated with the medication prescribed by Dr. McConnell.  While he had not seen it frequently, Dr. Tullis indicated he had seen Graves' disease during the course of thirty-five years of medical practice.  Dr. Tullis testified that Hashimoto's disease, also known as chronic thyroiditis, is an autoimmune disease where a person "basically became allergic" to her thyroid.  He testified he would not treat this disease and would have sent her to an endocrinologist.  With respect to her goiter, he testified it was a swollen thyroid gland and that Hanson had it when she entered the jail.

Dr. Tullis was familiar with the condition known as thyroid storm.  He testified it was when there was a release of too much thyroid hormones.  This condition can be life-threatening.  With respect to Hanson, he testified she was on a beta-blocker which prevented a thyroid storm.

Dr. Tullis noted that in December of 2009, tests showed that Hanson had bilateral ovarian masses.  It was concluded the masses were likely benign hemorrhagic cysts.  The cysts ruptured and a pelvic ultrasound taken on December 12, 2009, showed that the complex cystic masses were gone.  *Tullis Ex.* 2.  Dr. Tullis indicated that ruptured cysts can be painful.  He stated that Hanson had multiple CA125 blood tests none of which indicated the presence of ovarian cancer.  Additionally, because he was concerned Hanson might have cancer, he arranged for her to be seen at Dr. Erik Shultz's office for a gynecologic evaluation, including a endometrial biopsy, and no evidence of ovarian or other cancer was found.  *Tullis Ex.* 9.

Dr. Tullis received a letter from Hanson dated January 30, 2010.  *Tullis Ex.* 3.  He testified that this was the first complaint he had received from Hanson.  Up to this point in time, he indicated that all urinalyses done were normal.  Dr. Tullis did not believe there was a medical

-13-

need for Hanson to be seen by a urologist.  But to keep Hanson "happy," he testified he tried to get her an appointment.

Dr. Tullis wrote Hanson a letter dated February 25th outlining the medical care she had received to date.  *Tullis' Ex.* 6.  After Dr. Tullis learned that Hanson had written to the state medical board claiming that Norris and Dr. Tullis were denying her medical care, Dr. Tullis advised her by letter dated March 24th he would no longer coordinate her care.  *Tullis Ex.* 5; *Tullis Ex.* 8.  He informed her that he and Norris deferred her treatment and consultation to any local medical generalist or specialist she cared to see.  *Id.*  He also noted that her thyroid studies were "again borderline abnormal, and our consultants do not agree with the treatment you are receiving; however, we defer that completely to your endocrinologist in New York."  *Id.* After he had written this letter, Dr. Tullis testified he continued to help with Hanson's case if the jail asked him too.

The records show the following:

--on September 27, 2009, Hanson was treated at the Baxter Regional Medical Center Emergency Center for a urinary tract infection.  She was instructed to drink plenty of fluid and cranberry juice was especially recommended. Dr. Margo Lockyer prescribed Hanson an antibiotic, Cipro 250 mg., one tablet each day for five days.  *Tullis Ex.* 1; *BCDC Ex.* 3 at pgs. 1-5.

--on September 30th, Dr. Allen Jackson wrote a prescription that said:  "Please allow 4 ounces of cranberry juice twice daily as well as 1 banana daily.  Please allow second mat to sleep on."  *BCDC's Ex.* 2 at pg. 2.

--on October 1st Hanson was again treated at the emergency room for possible anemia.  She was advised to drink four ounces of cranberry juice twice daily and eat a banana daily and instructed to have her attorney call Dr. Bruce White when her medical records arrived for an appointment.  *BCDC's Ex.* 3 at pgs. 6-8.

--on October 19th, Hanson was seen for treatment of an infected toe nail. She was seen by Norris who offered to perform a wedge resection.  A note was made that she had possible vaginitis and she was prescribed diflucan.  *BCDC's Ex.* 2 at pg. 3.

-14-

--on October 22nd, she again complained about the toe nail and of severe bladder pain. She was seen by Norris on October 26th and prescribed Cipro. Norris offered again to perform a wedge resection. Norris also noted she should be taken to the hospital for lab work to check her potassium levels and for a urinalysis. *BCDC's Ex.* 2 at pg. 4.

--on November 10th, Hanson asked for Epsom salt to soak her toe. On November 13th, Norris approved Hanson's request for Epsom salts. *BCDC's Ex.* 2 at pg. 6.

--on December 8th, a final report was written regarding the results from the pelvic ultrasound. The diagnostic impressions were: (1) bulky, globular uterus with a fibroid present, and a small cervical cyst; and (2) bilateral, complex ovarian masses.

--on December 10th, Hanson submitted a medical request noting she had a history of ovarian tumors and hypothyroid. The plan was to get Hanson an appointment with a surgeon. She was prescribed atenolol, lortab, and PTU. *BCDC's Ex.* 2 at pgs. 7-8.

-on December 11th, Hanson submitted a medical request stating she had been coughing all night, her chest felt heavy, and she was vomiting. Norris saw her on the 27th and noted her examination was normal and that she had been to her gynecological appointment. *BCDC's Ex.* 2 at pg. 9.

--on December 12th, Hanson underwent an acute abdominal series as well as a pelvic ultrasound. The diagnostic impression for the pelvic ultrasound was that the complex cystic masses previously present in each ovary had ruptured. At that time, there were only small simple cysts in each ovary that were benign and there was no evidence of a tumor. *Tullis Ex.* 2; *BCDC's Ex.* 3 at pgs. 10-12.

--on December 16th, Hanson was seen by Dr. Erik Shultz as a result of abnormal uterine bleeding. An endometrial biopsy was taken. The results were normal. *Tullis Exs.* 7 & 9.

--on January 4, 2010, Hanson was seen as a result of a December 31st medical request stating she had a vaginal infection and severe bladder and abdominal pain. She was seen by Norris and prescribed diflucan and due to her complaint of vomiting and abdominal pain was scheduled for a CT scan of her abdomen and pelvis. Norris noted he had discussed her complaints with Dr. Tullis. *BCDC's Ex.* 2 at pgs. 10-11 & 13-14.

AO72A
(Rev. 8/82)

--on January 5th, Hanson under went a CT scan of the chest, abdomen, and pelvis. The results indicated that Hanson had "[b]ilateral benign-appearing ovarian cysts." *Tullis Ex.* 13. It was also noted that she had a large goiter. *Id. See also Tullis Ex.* 4.

--on February 5th, Hanson was seen at Baxter Regional Medical Center where a number of tests were run. She was diagnosed with dysuria[6] and prescribed Bactrim. *Tullis Ex.* 4; *BCDC's Ex.* 3 at pgs. 13-39.

--on February 12th, Hanson submitted a medical request complaining of severe urinary pain, edema in her lower legs and ankles, and a broken tooth. She told Norris she had an appointment with a private medical doctor scheduled. He approved her transport to the appointment. *BCDC's Ex.* 2 at pg. 15.

--on February 20th, Hanson submitted a medical request complaining of a yeast infection, swelling in the legs, and severe pain from urinary problems. On February 23rd, Norris noted Hanson had no edema in her extremities. She was prescribed diflucan and doxepin. *BCDC's Ex.* 2 at pg. 16.

--on March 23rd, Hanson underwent a pelvic ultrasound, a urinalysis, and a CA-125 test. The ultrasound showed no cystic or solid mass in either ovary. *Tullis Exs.* 7-8; *BCDC's Ex.* 3 at pg. 40-42. The urinalysis was normal. *Id.* The CA125 was within normal limits.

--on June 30, 2010, Hanson was seen at UAMS by Dr. C. Philip Hudson where she underwent a physical. He provided Hanson with a prescription calling for various additions to her diet including, meat, fruit, and vegetables. *Tullis Ex.* 10 at pg. 7; *Plff's Ex.* 34. He also noted that Hanson indicated the jail had a garden where fresh vegetables were available. *Tullis Ex.* 10 at pg. 10. A series of blood tests were ordered. *Id.* It was suggested the edema in her legs could be related to the amount of salt in her diet. *Id.*

--on July 2nd, Dr. Hudson, by letter, provided Hanson with the test results. *Tullis Ex.* 10 at pgs. 51-53. He noted the tests were essentially normal with the exception that she might have a "little too much thyroid." *Id.* He suggested she consult her endocrinologist. *Id.* He also canceled the food prescription as their was no evidence of malnourishment. *Id.*

---

[6] "Dysuria is a medical term for pain or discomfort when urinating." The condition is most "commonly . . . caused by bacterial infections of the urinary tract." http://www.intelihealth.com/IH/ihtPrint/WSIHW000/9339/25711.html?hide=t&k=basePrint. (Acessed February 4, 2013).

AO72A (Rev. 8/82)

Former Jailer Linda Henryk (Henryk) testified that, although she was no longer licensed, she had been an industrial pharmacist for a number of years. She stated that she tried to help with Hanson's medications. She testified that she recalled a number of medications being used to treat Hanson's conditions including several antibiotics for urinary tract infections. The medication logs indicate Hanson received the following medications:

Propylthiouracil, prescription for three tablets three times daily, was dispensed as follows: 9/25 (1); 9/26 (3); 9/27 (1); 10/1 to 10/8 (3); 10/12(2); 10/13-10/31 (3); 11/1 to 11/10 (marked refused);12/1-12/31(3); 1/1-3/31 (3); 5/2-5/7 (3); 5/8(1); 5/9-5/10(3); 5/11(2); 5/12-5/31(3); 6/1-6/29(3); 6/30(2);

Ciprofloxaon, prescription for one tablet twice daily--10/1-10/2 (2) & 10/3 (1); prescription for one tablet twice daily for seven days--10/27-10/31 (2); 11/1 to 11/30 (marked refused)[7]

Cranberry Juice, prescription for twice daily-- 10/12-10/14 (1); 10/16 (1);10/17 (2); 10/18 (2); 10/19 (1); 10/21 (1); 10/22 (2); 10/23 (1); 10/25 (1); 10/27 (2); 10/28 (1);  prescription for three times daily--2/5 (1); 2/6-2/15 (3);

Banana, prescription for one daily--10/10 (1); 10/14 (1); and 10/15 (1);

Listerine, prescription for four times daily--10/1 (2); 10/2 (1); 10/12 (1); 10/14(1) and 10/18 (1);

Miconazole 7 Cream--October with notation given to Hanson for yeast infection;

Oxybutynin, prescription for one each day--10/6-10/9 (1); 10/10-10/19 marked refused; 10/20 (1); 10/21-10/31 marked refused;

Levothyroxine, prescription for one tablet daily on Monday to Saturday and none on Sunday--10/1-10/8 (1); 10/13-10/17 (1); 10/19-10/31 (1); prescription changed to one tablet daily--12/1-1/29 (1), 1/31-3/31 (1); 6/1-6/31(1);

Phenazopyridine, prescription for ½ a tablet three times a day, 10/1 (3);

Phenaxopyrid (presumably Phenazopyridine), prescription for one tablet, three times daily for three days--2/5 (1); 2/6-2/9 (2);

---

[7] Several of the medication logs are dated 2008. The testimony indicated that the year should have been 2009.

-17-

Metronidazole, prescription one tablet, three times daily for seven days--2/2 (2); 2/3-2/4 (3); 2/5 (1); 2/6-2/14 (3) and 2/15 (2);

SMZ-TMP, prescription one tablet twice daily for two days--2/5(1); 2/6-2/14 (2); and 2/15 (1);

Anti-Nausea Liquid, prescription as needed up to four times daily--1/20 (1) & 1/24 (1);

Atenolol, prescription one tablet twice daily--12/11-2/20 (2); 2/21 (1); 2/22-3/31 (2); 5/2-5/10 (2); 5/11 (1); 5/12-5/17 (2); 5/18(1); 5/19-5/31(2); 6/1-6/23(2); 6/24(1); 6/25-6/30(2);

Vitatrum multi-vitamins, prescription one tablet daily--12/14-12/26 (1); marked refused for the remainder of December; 1/1-1/2 (1); 1/4 (1); 1/6-1/16 (1); 1/18-1/30 (1); 2/3-3/31 (1); 5/2-5/10 (1); 5/12-5/30 (1); 6/1-6/29(1);

Hydrocodone, prescription one tablet three times daily--12/16-12/31 (3);

Epsom Salts, prescription soak two times daily--11/14 (2); 11/15 (1); 11/18 (1); 11/19 (2); 11/21 (1); 11/31 (1); 1/5 (1); 1/8 (1);

Omeprazole, prescription for one tablet daily--1/5 (2); 1/6 to1/29 (1); 1/31-3/31 (1); 5/2-6/29(1);

AZO, prescription for two tablets three times daily as needed--1/20 (2); 1/21 (3) 1/23-1/24 (refused); and 1/25 (2); 1/26 (3); 1/27 (refused); 1/28 to 1/29 (3); 1/30 (refused) and

Doxepin, prescription for one tablet daily--2/23-2/25 (1); 2/26-2/28 (refused); 3/1 to 3/6 (refused); 3/16-3/26 (Hanson's initials not on these dates and a comment "don't bother" is written on the log).

UTA Cap Stew Jack, for urinary tract pain, prescription for one tablet every six hours--5/6(2); 5/8(1); 5/9 marked refused; 5/10(2); 5/12-5/29(4) times although all do not contain Hanson's initials; 5/30-5/31 (3); 5/1-5/4(3); the rest of the month refused the medication;

Fluconazole, prescription for 1 tablet a week--5/15(1); 5/22(1); 5/29(1); 6/5; 6/12; 6/19; 6/26;

POT Chloride, prescription for one tablet daily for five days--6/5-6/8(1);

-18-

Furosemide, prescription for one tablet a day for five days--6/5-6/8;

*BCDC's Ex.* 8.  No other logs were provided.

Prior to her release, Hanson had been seen by Dr. Thomas Herzog, a gynecologist.  *Tullis Ex.* 14.  On July 13, 2009, it was noted that Hanson had "bilateral simple cysts and no dominant mass."  *Id.*

After her release from incarceration, Hanson was seen at the Mayo Clinic in Rochester, Minnesota.  The etiology of her edema was determined to be unclear.  *Tullis Ex.* 11 at pg. 16.  It was suggested that she may want to discontinue the PTU as it could be contributing to the edema.  *Id.* at pg. 10.   Post-release Hanson was also seen at Saint Lukes Endocrinology and Diabetes in Kansas City, Missouri.  *Tullis Ex.* 12.

The undisputed evidence establishes that Hanson had serious medical conditions that required management by medical professionals.  I do not believe, however, that the evidence presents a sufficient disagreement as to whether Dr. Tullis or Norris exhibited deliberate indifference to Hanson's serious medical needs.  Dr. Tullis, although he provided medical care on a volunteer basis, responded to Hanson's needs, when he was made aware of them, by authorizing a number of diagnostic tests and referring her to other doctors.  He worked with Hanson's attorneys in an attempt to find medical experts who would treat Hanson.  Any failure to communicate Hanson's immediate needs for medical care are the fault of jail staff.

Dr. Tullis, like most doctors, was not involved in the dispensing of medication.  In the free world, the individual who receives the prescription is the one responsible for obtaining and taking the medication.  When the individual is incarcerated, the prisoner has no way of filling the prescription and is typically prohibited from keeping the medication in her cell.  Instead, it

AO72A
(Rev. 8/82)

is up to jail staff to obtain and dispense the medication on the prescribed basis. Additionally, jail staff at the BCDC act like the gatekeepers to medical care. In the BCDC, it is up to jail staff to determine whether medical personnel should be contacted and they also participate in a telephone triage when medical personnel are contacted.

Norris, while under contract with the jail, did not have any set schedule for addressing medical needs of inmates. Instead, he provided medical care only when contacted by jail staff. Norris was not notified when an inmate was booked in and advised jail staff of the existence of medical conditions. He was not notified when an inmate brought medication to the jail.

When he was contacted, he offered advice over the phone and usually saw the inmate in person within a few days. If the inmate had submitted a medical request, Norris viewed that when he saw the inmate. Norris had nothing to do with the dispensing of medication and only viewed the logs when an inmate advised him of problems with its distribution. While Norris' provision of medical care is less than optimal, there is insufficient evidence to create an issue of fact as to whether he exhibited deliberate indifference to Hanson's serious medical needs.

It is the Sheriff and his staff who control an inmate's access to medical care, including the distribution of medication. I believe the evidence presents sufficient disagreement to require submitting to the jury on the issue of whether Baxter County, Former Sheriff Montgomery, and Lieutenant Randall Weaver were deliberately indifferent to Hanson's serious medical needs. Certainly, it is undisputed that Hanson received medical care while she was incarcerated at the BCDC. However, there are issues as to the difficulty Hanson had in obtaining medical care, the timing of the care provided, inconsistencies in dispensing medication, and the failure of jail staff to notify Dr. Tullis or Norris of Hanson's medical needs. These issues turn on the policies

-20-

regarding medical care, the training of jail staff, as well as the response of command staff to Hanson's medical needs. The testimony establishes that command staff were aware of Hanson's medical conditions and her need for ongoing medical care. The medical care claim against the remaining jail staff, Helen Fenwick, Tony Beck, William Altrazan, should be dismissed.

### (B). Unconstitutional Conditions of Confinement

The Eighth Amendment to the United States Constitution prohibits the imposition of cruel and unusual punishment. U.S. Const. amend. VIII. The Cruel and Unusual Punishment Clause of the Eighth Amendment forbids conditions that involve the "wanton and unnecessary infliction of pain," or are "grossly disproportionate to the severity of the crime." *Rhodes v. Chapman*, 452 U.S. 337, 347 (1981). Prison conditions claims include threats to an inmate's health and safety. *Irving v. Dormire*, 519 F.3d 441, 446 (8th Cir. 2008)(citation omitted).

"[W]hen the State takes a person into its custody and holds him there against his will, the Constitution imposes upon it a corresponding duty to assume some responsibility for his safety and general well-being." *County of Sacramento v. Lewis*, 523 U.S. 833, 851 (1998)(citation omitted). The Constitution does not mandate comfortable prisons, but neither does it permit inhumane ones. *See Farmer v. Brennan*, 511 U.S. 825, 832 (1994).

Hanson maintains her conditions of confinement were unconstitutional because she was denied out of cell exercise, denied exposure to natural light, and denied an adequate diet. While there was testimony regarding the availability and limit on toilet paper, Hanson does not contend she was made to do completely without toilet paper, instead she maintains this was just one aspect of incarceration that made her feel like she was being treated like an animal. *See Stickley v. Byrd*, 2013 WL 141726 (8th Cir. Jan. 14, 2013)(limit of one roll of toilet paper not

-21-

unconstitutional--inmate was given a roll week, so was not always out of toilet paper, and when he did run out he was able to clean himself by taking a shower).

**(1). Exercise**

A constitutional violation exists if prison officials are deliberately indifferent to an inmate's exercise needs. *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992). A "lack of exercise may be a constitutional violation if one's muscles are allowed to atrophy or if an inmate's health is threatened." *Id.* Among factors the court should consider in reviewing such a claim are: (1) the opportunity to be out of the cell; (2) the availability of recreation within the cell; (3) the size of the cell; and (4) the duration of confinement. *Id.*

It has been recognized that "short-term denials of exercise may be inevitable in the prison context." *See Delaney v. DeTella*, 256 F.3d 679, 684 (7th Cir. 2001); *see* also *Leonard v. Norris*, 797 F.2d 683, 685 (8th Cir. 1986)(fifteen days of no out-of-cell exercise not cruel and unusual punishment); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(45 minute out-of-cell recreation time per week did not violate the Eighth Amendment rights of inmate in protective custody). Here, Hanson maintains she spent from December to July in an isolation (ISO) cell. She contends she was only occasionally allowed out of her cell and that exercise opportunities were limited. As a result of the lack of exercise and the lack of exposure to natural light, she maintains her health was adversely impacted.

She estimated that she was allowed to go on recreation twenty times in the eight months she was in ISO while other inmates had recreation on a daily basis. Although there was a room for recreation, Hanson testified she was not allowed to go there.

-22-

Several witnesses including William Altazan (Altazan), a jailer in 2090 and 2010, testified that at that time no log was kept for recreation.  He indicated it was the morning officer's duty to ask Hanson if she wanted to go out.  Altazan did not know how often Hanson went out.

Weaver testified that they tried to get everyone to outdoor recreation once a day.  He knew Hanson had refused recreation because, among other things, the time of day she was offered the opportunity.  However, he testified that there are large windows only twelve to fifteen feet from the ISO cells that allow natural light to come in.

Henryk testified that Hanson was offered recreation whenever the weather was good. Henryk did not recall how often Hanson went outside.

Both Krug and Ashery Tharp (Tharp) testified that Hanson never went to recreation with other female inmates.  Sherry Lewis (Lewis), a jailer in 2009-2010, testified that inmates in the ISO cells went to recreation at a different time than other inmates.  She said the ISO inmates were given one opportunity to go to recreation each day.

While Hanson preferred outdoor recreation, she does not maintain that it was impossible for her to exercise.  Additionally, she admits to having had outdoor recreation twenty times during the eight months she was confined to the ISO cell.  No evidence was presented to indicate Hanson's muscles atrophied as a result of inadequate opportunities to exercise.  No evidence presented indicates Hanson had any type of vitamin deficiency. In sum, there is insufficient evidence to suggest jail staff were deliberately indifferent to her exercise needs.  *Hosna v. Groose*, 80 F.3d 298, 306 (8th Cir. 1996); *see also Rahman X v. Morgan*, 300 F.3d 970, 974 (8th

-23-

Cir. 2002)(no deliberate indifference established when inmate was not allowed outside exercise for three months but was permitted to use a dayroom with exercise equipment for three hours each week).

**(2). Diet**

Next, Hanson claims she was denied a diet adequate to maintain her health. The Eighth Amendment's prohibition against cruel and unusual punishment is violated if an inmate is not provided with meals adequate to maintain his health. *See e.g., Keenan v. Hall*, 83 F.3d 1083, 1091 (9th Cir. 1996); *Wishon v. Gammon*, 978 F.2d 446, 449 (8th Cir. 1992)(prisoners have a right to nutritionally adequate food); *Campbell v. Cauthron*, 623 F.2d 503, 508 (8th Cir. 1980)(prisoners are guaranteed a reasonably adequate diet). To prevail on an Eighth Amendment claim, Hanson must show the Defendants were deliberately indifferent to her dietary needs. *Wishon*, 978 F.2d at 449.

Merely because the food served is not prepared to an inmate's taste does not implicate the Eighth Amendment. Rather, the Eighth Amendment is only violated if the food provided is inadequate to maintain good health. *See e.g., Burgin v. Nix*, 899 F.2d 733, 734-35 (8th Cir. 1990)(inmates do not have a right to be served a particular type of food); *see also Wilson v. Seiter*, 501 U.S. 294, 298 (1991)(the deprivation of food constitutes cruel and unusual punishment only if it denies a prisoner the minimal civilized measure of life's necessities).

Hanson asserts that the meals served each day did not vary and consisted of oatmeal for breakfast, a bologna sandwich on white bread for lunch, and beans and cornbread for supper. Although at some point, Hanson testified that she began receiving white rice in the place of

-24-

oatmeal.  Hanson testified she was allergic to oatmeal and to nitrates.  She also testified that she could not eat beans because they bothered her intestines.  When she asked to have just a cheese sandwich at lunch time, she testified she was told they could not do anything special for just one inmate without causing unrest among other inmates.  Hanson testified there were also times she did not eat because she believed the 309's[8] were ejaculating in it.

Even when a physician prescribed bananas and cranberry juice, Hanson testified she did not receive it.  Hanson stated she complained to anyone who would listen about the diet.

She indicated she ordered a lot of commissary items and would eat chips or cheetos and an occasional cookie.  Otherwise she testified that she gave a lot of commissary away to other inmates and to her husband who was also incarcerated.

Doneski was present when Dr. Hudson prescribed a better diet for Hanson.  During that visit, Doneski testified he stated that Hanson was malnourished.  Doneski stated she was going to pay for the Hanson's food and bring it to the jail.  A day or two later, Doneski was told not to bother bringing the food in because Dr. Hudson had rescinded the prescription after having talked to Sheriff Montgomery. Doneski testified one time she went to Chili's and got the Hanson a meal but the jail refused to take it.  She then went to Wal-Mart and bought frozen meals.  She delivered them to the jail; however, she learned Hanson only received two of the meals.

Doneski did, however, bring bananas and cranberry juice for Hanson following Dr. Jacksons' prescription.  She also informed both Weaver and Dr. Tullis that the Hanson could not

---

[8] Act 309 of 1983 as amended is an inmate program operated by the Arkansas Department of Correction.  The Director of the Department of Correction signs cooperative agreements with county and city officials for the purpose of providing additional space for the care and custody of State inmates on a temporary basis in detention facilities operated by counties and cities.  The inmates may be used to work in and around governmental property/projects while under supervision of the sheriff or chief of police or designee.

eat oatmeal and had an allergic reaction to nitrates in meat. Doneski believed she had spoken to Dr. Tullis two or three times during Hanson's incarceration.

Weaver testified the menu used had been approved by a dietician other than for Vitamin C. *BCDC Ex.* 16. He noted that the menu included some items not mentioned by other witnesses such as coffee and milk at breakfast; vegetables, chips, a cookie and a Vitamin C supplement at lunch; and vegetables with the beans and cornbread. Weaver testified the reason the Vitamin C supplement was provided is the diet contained no fruits. Others testified the menu varied on Thursdays when breakfast consisted of biscuits and gravy.

As discussed above, on June 30th, Dr. Hudson provided Hanson with a diet prescription directing that certain additions be made to Hanson's diet. Sheriff Montgomery visited the office of Dr. Hudson. Sheriff Montgomery asked why the doctor had prescribed Hanson a very particular diet. Sheriff Montgomery asked Dr. Hudson to review the results of the blood tests and then make the determination of whether the prescribed diet was necessary. On July 2, 2010, Dr. Hudson noted that Hanson showed "no evidence of anemia, malnourishment, vitamin deficiency, [or of] protein deficiency." *Tullis Ex.* 10 at pg. 52. After review of the BCDC diet, he found it to be "a proper one." *Id.* He canceled his food prescription as there was no medical need for it. *Id.*

Certainly, the menu was not what one would desire. However, that is not the issue. The issue is whether Hanson was provided with meals adequate to maintain her health. I do not believe there is sufficient disagreement regarding her diet to require submission to a jury. There was no evidence presented suggesting the diet was not sufficient to maintain Hanson's health.

Perhaps most telling is that Dr. Hudson, after considering the diet she was provided and doing various tests on Hanson, concluded there was no evidence she was malnourished, anemic, or suffered from a vitamin deficiency, or of protein deficiency.

### (C). Privacy Rights

"[A] prison inmate has a far lower expectation of privacy than do most other individuals in society," *Goff v. Nix*, 83 F.2d 358, 365 (8th Cir. 1986), and retains "very narrow zones of privacy," *Hill v. McKinley*, 311 F.3d 899, 905 (8th Cir. 2002). "[A] prisoner's Fourth Amendment privacy rights are not violated" when a male guard requires a female inmate to disrobe. *Id.* at 903. Similarly, "[s]urveillance of male inmates by female guards, including observation of them in the bathroom and shower, was not unreasonable . . . when "the sex-neutral practice neither impermissibly violated the inmates' privacy nor the guards' equal opportunity rights." *Booker v. City of St. Louis*, 309 F.3d 464, 468 (8th Cir. 2002).

In determining whether Hanson's privacy interests have been violated, the Court must consider the factors outlined in *Turner v. Safley*, 482 U.S. 78 (1987). In *Turner,* the Court held that a prison "regulation is valid if it is reasonably related to legitimate penological interests." *Id.* at 89. The Court is to weigh the following four factors: (1) whether a valid, rational connection exists between the regulation and the penological interest offered to justify it; (2) whether the inmate has an alternative means of protecting the right; (3) whether accommodation of the right would significantly affect prison resources; and (4) whether there is an obvious, simple alternative to the challenged regulation. *Id.* at 89-90.

-27-

Hanson testified she had to dress, undress and use the toilet in view of guards of the opposite sex, inmates of the opposite sex, and civilian visitors.  Whenever a pod door was open, Hanson testified she could be seen by other inmates.  She stated that the doors opened virtually on a non-stop basis.  She testified she had to endure male inmates uttering vulgarities about her.  She also testified that the male 309 inmates were allowed access to the women prisoners.  She stated they delivered food and uniforms.

Hanson testified she asked for a shirt, towel, black paint, or anything to cover the window with so that she had some privacy.  Her testimony was supported by that of Marczuk who testified Hanson was in an ISO cell for a significant period of time.  He indicated that inmates in either of the two ISO cells could be seen from the waist up because of the glass window.  If he was within three to five feet of the door, he could view the inmate on the toilet. The toilets were at the very back of the cells.  There was a wall between ISO cell one and two.  The inmates could speak to each other but could not see each other.

The windows on the ISO cells opened into a multi-purpose room that had long rectangular tables.  This was the room Marczuk usually met with clients in.  Anyone who came out for recreation, was being dispensed medicine, or came through the multi-purpose room for any reason could see the inmates in the ISO cells.  In fact, Marczuk testified that he quit sitting at the front table for a number of reasons one of which was that he did not want to get into a "peeping Tom" situation.

Weaver testified that other inmates could see into the ISO when the cell doors would open.  He said Hanson could be seen from the waist up and had no privacy when changing.

-28-

Weaver indicated he would not allow Hanson to cover the window but did not consider the lack of privacy. Having said that, Weaver testified there was no reason that some type of covering could not be on the window. He did recall that Hanson asked for a two piece uniform so she did not have to disrobe from the top. In fact, he said that not long after she went into ISO she was provided with a two piece uniform.

Henryk testified that Hanson was placed in ISO for her safety. They feared there might be ramifications from other women inmates who were angry.

Sheriff Montgomery testified that the window of the ISO cell was approximately four feet by five feet. He believed it was possible male inmates could see into the ISO cell if the pod door was open. In general, he testified that they did not allow windows to be covered for safety reasons. He indicated he never considered replacing the glass with tinted glass.

Krug testified that inmates wore jump-suits. When assigned to one of the ISO cells a/k/a "fish bowl cells," she testified you had to take your jump-suit down in front of the window. She indicated it felt like sexual harassment. Any attempts to cover the window with newspaper, toilet paper, or toothpaste caused problems with jail staff and had to be taken down. Krug testified she was in the BCDC in 2007, 2009, and 2010 and had never seen another female housed there.

Tracy Standridge (Standridge) testified that in 2010 she was incarcerated at the BCDC and was aware of Hanson being in ISO1 or the "fish tank." When the door to pod A opened, she testified she could see Hanson and the toilet. However, she did not recall seeing Hanson using the toilet or changing her uniform. Standridge was aware of other women being housed in the ISO cells. When you went to recreation, she testified you had to walk by the ISO cells and she

-29-

could see Hanson.  When medication call was done, the inmates would all be lined up in the hallway.

Jason Marshal testified that he was housed for two months in an ISO cell and spent the rest of his time in B pod.  He indicated inmates had visual access to the Hanson when the pod door would open for meals, at medication call, when the cleaning cart was moved from pod to pod, when an attorney met with a client, and when the inmates went to the recreation yard.  He heard a number of crude comments made about Hanson.  To his knowledge, Hanson was the first female put in an ISO cell.

Samuel Noakes was a 309[9] inmate from the Arkansas Department of Correction, Cummins Unit.  As a trustee, he had a variety of duties including delivering meals and supplies.  In this capacity, he had access to female inmates.  While he could see into the ISO cell, he did not recall ever seeing Hanson changing her uniform or on the toilet.  He also had access to the control tower and could have seen Hanson on the video camera.

Lewis testified that women were housed in the ISO cells.  For safety reasons, ISO inmates were not allowed to cover the window.  She testified this was to ensure the inmate was not doing anything to jeopardize her safety.  No provision was made to block the view of the females.  Lewis also testified that there is a camera in the cell that can be used to monitor the inmates if the window is covered.  However, if an inmate stood was against the door, the video camera provided only a partial view.

---

-30-

While safety and securing of the institution provides a valid justification for many rules and regulations, there are issues of fact in this case as to whether there was a valid rational reason for subjecting Hanson to both video surveillance and visual surveillance at the expense of her privacy from third parties.  Hanson was subjected to the involuntary exposure of her body to everyone who passed by, or were standing, outside the window of the ISO cell.  She testified that this exposure was hurtful and demeaning.  This is not a case where the exposure only involved members of the jail staff.  If that were the case, the lack of privacy may well be completely permissible.  *See e.g., Timm v. Gunter,* 917 F.2d 1093, 1102 (8th Cir. 1990)(opposite sex surveillance performed on the same basis as same-sex surveillance not unreasonable where justified by safety and equal employment concerns).  Moreover, Hanson does not challenge the right of the jail to maintain camera surveillance.  Instead, she maintains that she had no way to minimize invasions of her privacy created by the window in the ISO cell.

Accommodation would appear to be simple.  Either cover the window completely or provide the inmate with the means to cover the window or in some other manner shield themselves from view when dressing and using the toilet.  Weaver testified that he gave no thought to the lack of privacy afforded Hanson.  He also indicated there was no reason the window could not be covered.

The undisputed testimony established that Hanson could be viewed by anyone passing by the ISO cell. Jail staff, inmates, and civilians, of either sex, were in a position to view Hanson whenever they were passing through the multi-purpose room.  Additionally, the testimony establishes that whenever a pod door was open male inmates could view Hanson.  There was no part of the cell that was blocked off in anyway.  The cell also contained a camera which could

-31-

be viewed from the control room. Avoiding credibility determinations, and drawing all justifiable inferences in Hanson's favor it is clear that this claim should be heard by a jury.

### 3.  Conclusion

For the reasons stated, I recommend the following: (1) all claims against Dr. Tullis and Wilton Chip Norris be dismissed; (2) the conditions of confinement claims be dismissed; and (3) all claims against Jailer Helen Fenwick, Jailer Tony Beck, Jailer William Altrazan, and Jailer Garnett McMahon be dismissed. This would leave for submission to the jury Hanson's medical care and privacy claims against Baxter County, Sheriff Montgomery, and Lieutenant Randall Weaver.

**The parties have fourteen (14) days from receipt of the report and recommendation in which to file written objections pursuant to 28 U.S.C. § 636(b)(1).  The failure to file timely objections may result in waiver of the right to appeal questions of fact.  The parties are reminded that objections must be both timely and specific to trigger de novo review by the district court.**

DATED this 5th day of February 2013.

/s/ *J. Marschewski*

HON. JAMES R. MARSCHEWSKI
CHIEF UNITED STATES MAGISTRATE JUDGE

AO72A
(Rev. 8/82)